Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
BRIAN S. KING PC
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| E.W. and I.W.,<br><br>        Plaintiffs,<br>vs.<br><br>HEALTH NET LIFE INSURANCE COMPANY, and HEALTH NET OF ARIZONA, INC.<br><br>        Defendants. | MOTION FOR SUMMARY JUDGMENT<br><br><br><br>Civil No. 2:19-cv-00499-TC-DBP |

Plaintiffs E.W. and I.W. (collectively, "Plaintiffs"), through their undersigned counsel, hereby move the Court to award summary judgment in their favor against Defendants Health Net Life Insurance Company and Health Net of Arizona, Inc. (collectively, "Defendants").

## **INTRODUCTION**

After struggling for years with major depressive disorder, anxiety, anorexia, and impulses to self-harm – which collectively led to at least five suicide attempts requiring hospitalization – Plaintiff I.W. received care at Uinta Academy ("Uinta"), a residential treatment center specializing in providing mental health care to adolescents. Defendants partially denied coverage

1

for that treatment, contending that I.W.'s care was not medically necessary after February 22, 2017. In fact, I.W.'s care was medically necessary both under the terms of the Plan and under the terms of the criteria Defendants' internal reviewers employed to justify their denials.

The evidence in the administrative record shows that Defendants failed to provide Plaintiffs with a full and fair review in the appeals process and pay the benefits that I.W. was entitled to under the terms of the Plan. Further, the record also demonstrates that Defendants failed to comply with the minimum obligations set for them by the Employee Retirement Income Security Act of 1974 ("ERISA") and its accompanying regulations. For those reasons, Plaintiffs ask this Court to reverse Defendants' denial of benefits to I.W. and issue an order instructing Defendants to compensate Plaintiffs for the costs of I.W.'s treatment at Uinta that Defendants should have paid, as well as prejudgment interest and reasonable attorney fees and costs.

## STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

1. Plaintiffs E.W. and I.W. are natural persons residing in Maricopa County, Arizona. E.W. is I.W.'s father.[2]

2. Defendant Health Net Life Insurance Company issued, and Defendant Health Net administered, an insurance plan (the "Plan") that covered Plaintiffs during the treatment at issue in this case.[3]

### General Plan Terms

3. Because I.W. received care at Uinta in both 2016 and 2017, there are two sets of insurance plan documents relevant to this case – one that was in effect in 2016[4] and

---

[1] In this ERISA case, a copy of the pre-litigation record (the "Record") has been filed under seal with the Court. The Record consists of documents Bates stamped HealthNet_000001 through HealthNet_006785. For purposes of this motion, Plaintiffs will refer to these documents as Rec. 0001 through Rec. 9529.
[2] *See* Defendants' Answers, ECF Doc. Nos. 29 and 30, ¶ 1.
[3] *See* Defendants' Answers, ECF Doc. Nos. 29 and 30, ¶¶ 2-3.
[4] *See generally* Rec. 0178-363.

one that was in effect in 2017.[5] Because the terms of these documents are largely identical, Plaintiffs refer to their terms as terms of "the Plan" unless the 2016 and 2017 terms materially differ.

4.   The Plan provides that "[e]xcept for preventative services, all Covered Services under this health plan must be Medically Necessary."[6]

5.   The Plan defines the terms "Medically Necessary or Medical Necessity" to mean:

> health care services that a Physician, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an Illness, Injury, disease or its symptoms, and that are:
>
> 1.  In accordance with generally accepted standards of medical practice;
> 2.  Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's Illness, Injury or disease; and
> 3.  Not primarily for the convenience of the patient, Physician, or other health care Provider, and not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's Illness, Injury or disease.
>
> For these purposes, "generally accepted standards of medical practice" means standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, Physician Specialty Society recommendations, the views of Physicians practicing in relevant clinical areas and any other relevant factors.

---

[5] *See generally* Rec. 0364-555.
[6] Rec. 0245.

> The fact that a Provider may prescribe, order, recommend or approve a treatment, service, supply or medicine does not in itself make the treatment, service, supply or medicine Medically Necessary.[7]

6. The Plan also defined "Residential Treatment Center" to mean "a twenty-four hour, structured and supervised group living environment for children, adolescents or adults where psychiatric, medical and psychosocial evaluation can take place, and distinct and individualized psychotherapeutic interventions can be offered to improve their level of functioning in the community."[8]

7. The Plan further provided that: "[i]f a Claim for reimbursement or payment for health care services is denied by [Defendants], the Subscriber may obtain a review of the denial through [Defendants'] appeal procedures."[9]

8. Although they are not mentioned in the Plan, Defendants' reviewers used the "McKesson InterQual® Behavioral Health Criteria 2016.3 Child and Adolescent Psychiatry" (the "InterQual Criteria") to evaluate whether I.W.'s care was medically necessary.[10]

9. A full copy of the applicable InterQual Criteria are included on pages 0001-0104 of the administrative record.[11]

10. According to the InterQual Criteria, once a patient is admitted into a "Residential Treatment Facility" continued care is medically necessary and the patient is "not

---

[7] Rec. 0345.
[8] Rec. 0350.
[9] Rec. 0320.
[10] *See* Rec. 0105-06, 6981-82.
[11] *See* Rec. 0001-0104.

4

clinically stable for discharge" if, in the case of a patient with an "Eating Disorder,"

the patient was found within the last week to be any of the following:[12]

> …
> - Unable to make appropriate food choices without assistance or supervision at all meals
> …
>> o Attempting to restrict at meals even when supervised by staff
>> …
>> o Food refusal or persistent decline in oral intake
>> … [or]
>> o Restricting at meals when not supervised[.]
>> …[13]

11. The InterQual Criteria also provide that once a patient is admitted into a "Residential

Treatment Facility," continued care is medically necessary and the patient is "not

clinically stable for discharge" if, in the case of a patient experiencing a "[s]erious

emotional disturbance," any of the following were found to apply to the patient within

the last week:[14]

> …
> - Easily frustrated and impulsive
> …
> - Persistent rule violations
> … [or]
> - Sexually inappropriate
> …[15]

12. In addition, the InterQual Criteria provided that continued care at a "Residential

Treatment Facility" would be medically necessary, and the patient "not clinically

---

[12] *See* Rec. 0032-37.
[13] *See* Rec. 0037.
[14] *See* Rec. 0032-37.
[15] *See* Rec. 0037-38.

stable for discharge[,]" if within the past week the patient was "[u]nable to establish positive peer or adult relationships[.]"[16]

**I.W.'s Childhood and Struggles with Mental Illness**

13. I.W. was always a temperamental child, with difficulty regulating her emotions and a tendency to lash out with physical violence or become very distraught when something had upset her.[17]

14. That said, I.W. was also a very intelligent child, who displayed "great memory" and a "fast and easy" capacity for learning.[18]

15. At the age of 7, I.W. was diagnosed with ADHD.[19]

16. In the 2012-2013 school year, I.W.'s seventh grade year, I.W. began to experience trouble maintaining her attention and finishing projects at school.[20]

17. Concerned that I.W. may be experiencing complications related to her ADHD or some other mental health disorder, I.W.'s parents had her evaluated by Dr. Charissa P. Pe Benito, a developmental pediatrician, on June 5, 2013.[21]

18. Dr. Benito indicated that I.W. scored very high on the "Children's Depression Inventory[,]" which Dr. Benito described as a "clinically significant" indicator for "mood/depressive symptoms."[22]

---

[16] *See* Rec. 0038.
[17] *See* Rec. 7022.
[18] *Id*.
[19] *See* Rec. 7026.
[20] *See* Rec. 7023.
[21] *See* Rec. 7022-27.
[22] *See* Rec. 7025.

19. Dr. Benito suggested that I.W.'s parents monitor her symptoms and suggested several modifications to I.W.'s patterns at school intended to address her ADHD and incipient depression.[23]

20. Despite her family's commitment to these modifications, beginning in 2013 I.W. began to feel "depressed on a daily basis" and began to feel like she was "putting on a mask" to satisfy the expectations of people around her.[24]

21. In addition, I.W. began experiencing anxiety and persistent "hopelessness and guilt" in 2013.[25]

22. In 2013, I.W. also began "engaging in self-harming behavior[,]" first by "scratching herself with a metal pick[,]" then by "using a sharp, rounded blade to cut her arms and legs."[26]

23.  I.W. also began struggling with anorexia in 2013, and sometimes limited her food intake solely to "apples, watermelon, and celery[.]"[27]

24. As time went on, I.W. observed that "her self-harming behavior escalated" when she did not restrict her diet.[28]

25. I.W.'s self-harming behaviors and struggles with anorexia, depression, and anxiety continued until 2015, and her parents began noticing that she was struggling as a result.[29]

---

[23] *See* Rec. 7022-27.
[24] Rec. 7029.
[25] Rec. 7029-30.
[26] Rec. 7030.
[27] *Id*.
[28] *Id*.
[29] *See generally* Rec. 7029-37.

26. On October 23, 2015, I.W.'s parents had her evaluated by Dr. Daniel Amen, a psychiatrist.[30]

27. Dr. Amen found that I.W. had symptoms of "Major Depression, overfocused" and "Generalized anxiety disorder," in addition to her ADHD.[31]

28. In November of 2015, I.W.'s parents referred her to "Lisa M. Bravo, DBH, LPC, LISAC, NCC – a Doctor of Behavioral Health, Licensed Professional Counselor," and "Licensed Independent Substance Abuse Counselor."[32]

29. Dr. Bravo performed cognitive behavioral therapy with I.W. in hopes of reducing her symptoms of "poor distress regulation, impulsive behaviors, insomnia, and suicidal ideation."[33] In addition to Dr. Bravo's efforts, I.W. was also "prescribed antidepressants and mood stabilizer[s]."[34]

30. Despite this, I.W.'s "symptoms and ideations continued to escalate as well as her risk-taking behaviors and suicidal ideation."[35]

31. As Dr. Bravo would later note:

> In 2016, [I.W.] had 5 known suicide attempts in which she presented to the emergency department. On April 10, she overdosed on Effexor;[36] on May 16, 2016, she overdosed on Xanax; on June 24th, 2016 she purposely consumed peanut better to which she has a severe allergy[,] in an attempt to suicide; and on July 9, 2016, she overdosed on ibuprofen and drank hand sanitizer.[37]

---

[30] *See id*.
[31] Rec. 7034-36.
[32] Rec. 7048.
[33] *Id*.
[34] *Id*.
[35] *Id*.
[36] The Court can take judicial notice that "Effexor," otherwise known as venlafaxine, is an antidepressant and antianxiety medication. *See* https://www.effexorxr.com/.
[37] *Id*.

32. After I.W.'s second attempted overdose, both Dr. Bravo and I.W.'s psychiatrist recommended that I.W. receive "a higher level of care."[38]

**I.W.'s Treatment at Uinta and Defendants' Denials**

33. On September 12, 2016, I.W. began receiving treatment at Uinta.[39]

34. Uinta is an Adolescent Mental Health Residential Treatment Center[40] located in Wellsville, Utah.[41]

35. On February 13, 2017, I.W.'s treatment team learned from another patient that I.W. had recently drunk Benadryl in order to get high.[42]

36. As a result of this substance abuse, one of I.W.'s treating clinicians chose to cancel a planned home visit, writing shortly afterwards that: "[I.W.] is *in relapse and continues to need a structured and supervised environment to be able to relapse [safely]*. Her behaviors would have been much more dangerous *if she had been at home*."[43]

37. On February 22, 2017, eight days after I.W.'s clinician and treatment team noted that she was in relapse and that her behaviors would be much more dangerous at home, Defendants decided to deny coverage for any further treatment I.W. received at Uinta.[44]

38. On February 27, 2017, I.W.'s treatment team discovered that she had been engaging in inappropriate sexual behavior with one of her peers.[45] I.W.'s clinician noted that

---

[38] *Id.*
[39] *See* Rec. 4573.
[40] *See* Rec. 0563.
[41] *See* Rec. 4017.
[42] *See* Rec. 3397.
[43] Rec. 3393 (emphases added).
[44] Rec. 0105-111
[45] *See* Rec. 3350.

I.W. "did not admit" to the sexually inappropriate behavior until notes confirming the behavior were shown to her.[46]

39. On March 1, 2017, Defendants memorialized their decision to deny I.W.'s claims for treatment received at Uinta from February 22, 2017 onwards in a letter.[47]

40. In the letter, Defendants' rationale for denying I.W.'s claims was that Defendants used:

> McKesson InterQual medical necessity standards to help decide if continued stay at the Adolescent Mental Residential Treatment Center (RTC) level of care is needed. These standards state that there must be reports within the last week of physical altercations, sexually inappropriate behavior, evidence of worsening depression, runaway behavior, self-mutilation, or suicidal or homicidal ideation. Based on the clinical information provided to [Defendants], your daughter is not having any of those symptoms or behaviors. It is reported that she has learned many healthy coping skills and is working on strategies to control her anxiety. She has been opening up significantly in therapy and is no [sic] beginning to address core issues related to her poor self-image and thinking errors. Therefore, this request for ongoing treatment at the Adolescent Mental Health RTC level of care does not meet medical necessity criteria.[48]

41. However, Defendants did not actually send this letter to Plaintiffs,[49] and indeed, would not do so until June 8, 2018.[50]

42. On March 1, 2017, I.W.'s clinician noted in a "Therapy Progress Note[ ]" that: "[I.W.] reported that over the last few weeks she has been feeling depressed and anxious."[51] The clinician also noted that I.W. self-reported that she would "get full fast" when eating, but that she "continue[d] to struggle in gaining weight."[52]

---

[46] *See id.*
[47] *See* Rec. 0105-111.
[48] Rec. 0105-6.
[49] *See* Rec. 3117.
[50] *See* Rec. 2253-61.
[51] Rec. 3342.
[52] *Id.*

Apparently concerned that I.W. was restricting her food intake, I.W.'s clinician noted that "[s]taff have increased eye-sight and passing off her meals and snacks. They will also start doing pocket checks after each meal and snack."[53]

43. On March 1, 2017 I.W.'s treatment team also noted that I.W. had difficulty maintaining "boundaries" and "no contact" with her peers.[54] The context of later notes made by her treatment team imply that I.W. was continuing to contact the peer with whom she'd had an inappropriate sexual relationship.[55]

44. On March 2, 2017, I.W.'s clinician noted that I.W. was having difficulty enforcing boundaries and that, in general, "[I.W.] appeared unsure of what she really wants at this time. She reports she wants to make changes, but does not know how to start."[56]

45. Then, on March 4, 2017, I.W.'s treatment team caught her throwing away food in violation of the treatment plan to address her eating disorders.[57]

46. On March 6, 2017, I.W.'s treatment team observed that I.W. was struggling "saying no assertively to her peers" and failing to set "appropriate boundaries with her peers."[58]

47. On March 15, 2017, when discussing her upcoming first home visit with her clinician, I.W. indicated that she had been thinking about how "easy" it would be "to restrict food on the visit."[59] I.W.'s clinician indicated that "[I.W.] continues to compare her weight to another peer's in the home. She is still body conscious."[60] This led I.W.'s

---

[53] *Id.*
[54] Rec. 3340.
[55] *See* Rec. 3140, 3263, 3335.
[56] Rec. 3338.
[57] Rec. 3330.
[58] Rec. 9443.
[59] Rec. 3290.
[60] *Id.*

clinician to e-mail her parents to warn them about I.W.'s thoughts and "[r]eiterate rules and expectations around eating patterns and supervision during the visit."[61]

48. I.W. had her first home visit from March 16, 2017 to March 20, 2017.[62]

49. On March 22, 2017 I.W. and her parents discussed her first home visit in family therapy.[63] During that therapy, I.W.'s parents "expressed that [I.W.] immediately engaged in old patterns of wanting sister to keep secrets and emotionally grooming sister to get what she wanted."[64]

50. Following the March 22 family therapy, I.W.'s clinician noted that "[i]t appeared [I.W.] struggled to maintain good boundaries with [her] sister and easily fell into old patterns" during her home visit, but on a positive note indicated that there had been "[n]o self-harming" on the visit.[65]

51. On March 23, 2017, I.W.'s treatment team caught her once again "passing notes to another peer who she has an unhealthy relationship with."[66] When confronted, I.W. "reported she intended to stay in contact with this peer" despite being "on no contact" with them.[67]

52. On April 11, 2017, I.W.'s treatment team indicated that she had been placed "on arms"[68] while eating and that she was not going to be afforded privacy during her shower time.[69]

---

[61] *Id.*
[62] *See* Rec. 3272, 3286.
[63] *See* Rec. 3267.
[64] *Id.*
[65] *Id.*
[66] Rec. 3263.
[67] *Id.*
[68] As made evident by Rec. 3173 and 3192, placing a patient "on arms" apparently entailed subjecting them to close personal supervision during mealtimes, apparently to prevent them from restricting food or otherwise indulging in disordered eating.
[69] Rec. 3197.

53. On April 12, 2017, two of I.W.'s treating clinicians and an educational specialist (her "treatment team") collaborated to create a "Treatment Plan Review" analyzing I.W.'s progress towards the treatment goals set by Uinta.[70]

54. In the Treatment Plan Review, the treatment team noted that I.W. continued to struggle with "Generalized Anxiety Disorder," "Major Depressive Disorder," and "Parent-child relational problem."[71]

55. With respect to I.W.'s Generalized Anxiety Disorder, specifically, the treatment team stated that:

> [I.W.] is developing skills to effectively manage her anxiety. [I.W.] expresses less physical symptoms that are an indication of panic attacks. She reports that her level of anxiety has decrease[d]. It is observed that [I.W.] struggles to focus and stay present when feeling anxious. [I.W.] is able to identify thinking errors that increase her anxiety, but struggles to reframe those thoughts in the moment. She continues to need prompts from staff to implement skills. [I.W.] is more likely to identify and express how she is feeling in the moment with staff. She is opening up in therapy and beginning to address core issues that have impacted her low self-esteem. This is being addressed in the milieu. [I.W.] remains on arm's length during meals and for one hour after meals.. It is observed that [I.W.'s] anxiety increases around and after mealtime. [I.W.] continues to express a lot of anxiety in her relationships. Fear of rejection causes her to struggle with boundary setting.[72]

56. With respect to I.W.'s Major Depressive Disorder, the treatment team indicated that:

> [I.W.] reports an increase in her mood. She reports that she has had no thoughts of self-harm or suicide. It is observed that [I.W.] is developing skills to increase her self-esteem and confidence. She continues to work on implementing the skills on a consistent basis. [I.W.'s] ability for insight has increased and she is able to recognize past and present experiences that lead to her depressed mood. [I.W.] is learning to address the thinking errors that lead to decreased mood. She is learning to increase her mood and self-esteem by expressing positive self-thoughts and expressing more

---

[70] *See* Rec. 3157-58.
[71] Rec. 3157.
[72] *Id*.

13

optimism. It is observed that [I.W.] struggles at times to challenge her thoughts and can easily get discouraged. During these times she will become argumentative and disagreeable. [I.W.] is beginning to address her core issues, but is observed to be very guarded still. [I.W.] has recently reported discouragement about being at Uinta. [I.W.] struggles to accept consequences and to take accountability for her behaviors.[73]

57. With respect to I.W.'s "Parent-child relational problem," the treatment team indicated that:

> [I.W.] continues to work on improving the relationship with her parents. She is working on taking more accountability and responsibility for her behaviors. At times she struggles to recognize that [it] was her unhealthy behaviors that lead to her coming to Uinta. At times, [I.W.] will express anger towards her parents and want to blame them for being in an RTC. [I.W.] is learning to identify what is underneath her anger and talk more openly with her parents. They are working on effective communication and listening skills. [I.W.] is also working on improving the relationship with her siblings. [I.W.] and her parents are learning to be more accepting of each other's differences in opinions, values, and beliefs.[74]

58. In the Treatment Plan Review, the treatment team recommended "that [I.W.] continue her treatment at Uinta. *If she were to discharge at this time, it is highly probable that [I.W.] would relapse and re-engage in unhealthy and risky behaviors.*"[75]

59. However, the treatment team also recommended "that [I.W.] return home after completing the therapeutic program at Uinta" and "that [I.W.] participate in an Intensive Out-Patient Program upon returning home."[76]

60. On April 14, 2017, I.W.'s treatment team caught her lying about her food intake and I.W. argued with her treatment team about finishing the food served for her lunch.[77]

---

[73] *Id.*
[74] Rec. 3158.
[75] *Id.* (emphasis added).
[76] *Id.*
[77] *See* Rec. 3183-84.

14

61. On April 18, 2017, I.W.'s treatment team further observed that "after [I.W.] eats a meal or one of her proteins, [ ] she runs off out of eyesight to get her water bottle, do an outside chore, or something else [out of the staff's visual supervision]."[78] This apparently caused enough concern that her treatment team later "talked to [I.W.] about having to be on arms an hour after eating."[79]

62. On April 26, 2017, I.W. faked a fainting episode while "on arms" during a meal, then pretended that she did not know she had fainted when staff "woke" her.[80]

63. That same day, I.W.'s clinician noted that I.W. was "struggling to implement skills to avoid old unhealthy patterns. She continues to struggle with setting boundaries . . . [and] remains engaged with underground behavior with peers."[81]

64. On April 29, 2017, I.W. once again attempted to persuade her treatment team to let her restrict her food, by claiming "her stomach was [too] small" for the food she had been served at dinner.[82] The treatment team enforced I.W.'s treatment plan and made her finish her food.[83]

65. On May 4, 2017, I.W. faked another fainting spell.[84]

66. On May 8, 2017, I.W.'s clinician confronted her about fabricating fainting spells.[85] The clinician noted that I.W. "acknowledged the behaviors, but could not provide a reason as to why she was engaged in the attention seeking."[86]

---

[78] Rec. 3171.
[79] Rec. 3168.
[80] Rec. 3137.
[81] Rec. 3140.
[82] Rec. 3129.
[83] *Id*.
[84] Rec. 3102.
[85] *See* Rec. 3090.
[86] *Id*.

67. On May 15, 2017, I.W.'s clinician confronted her a second time about her fabricated fainting spells, and then focused her therapy "on [I.W.'s] lack of identity and where to start on rebuilding that."[87]

68. On the recommendations of her clinician and treatment team, I.W. continued to remain "on arms" with staff during mealtimes through at least June 6, 2017.[88] At some point following this, she was afforded more freedom to control her own eating process.

69. However, on July 31, 2017, I.W.'s clinician noted that I.W. self-reported she was "following her treatment plan around eating," but that I.W.'s treatment team had observed that I.W. was not gaining weight and was "trying to get out of eating" all of the food included in her plan.[89] I.W.'s clinician also expressed that I.W. felt "stuck" and did not know how to move forward with respect to her anorexia.[90]

70. On August 4, 2017, I.W.'s clinician expressed concern that I.W. appeared to be "romanticizing" the experience of getting high.[91]

71. On October 6, 2017, following an instance where I.W. concealed a sexual relationship from her parents while on a home visit,[92] I.W.'s clinician wrote that I.W.'s "behaviors are reflective of relapse" and briefly extended her treatment to address this.[93]

72. Following this, I.W. continued therapy and was able to successfully discharge from Uinta in December of 2017.[94]

---

[87] *See* Rec. 9459.
[88] *See* Rec. 2989.
[89] Rec. 9469.
[90] *Id*.
[91] Rec. 9470.
[92] Rec. 9476-79
[93] Rec. 9480.
[94] *See* Rec. 9481-88.

**Plaintiffs' Appeals of Defendants' Denials**

73. On May 10, 2018, Plaintiffs contacted Defendants and informed them that Plaintiffs had never received the March 1, 2017 letter denying coverage for the care I.W. received after February 22, 2017.[95] In that letter, Plaintiffs requested that Defendants "complete a full and fair review of [I.W.'s] medical records, included with this letter, and issue a valid determination letter" concerning I.W.'s treatment.[96]

74. Plaintiffs included I.W.'s medical records pertinent to her treatment at Uinta along with their May 10 letter.[97]

75. On June 8, 2018, Defendants sent a letter to Plaintiffs that communicated Defendants' March 1, 2017 letter denying coverage for the first time.[98]

76. In a letter dated July 16, 2018, Defendants upheld their denial of I.W.'s treatment from February 22, 2017 onward.[99]

77. Defendants' internal reviewer, an unnamed Arizona physician "board certified in Obstetrics and Gynecology" indicated that he or she had determined to uphold the denial because:

> InterQual criteria standards state that there must be reports within the last week of either physical altercations, sexually inappropriate behavior, evidence of worsening depression, runaway behavior, self-mutilation, suicidal or homicidal ideation. Based on the clinical information provided to [Defendants], your daughter was not having any of these symptoms or behaviors. Therefore, this request for ongoing treatment at the Adolescent Mental health RTC level of care did not meet medical necessity criteria.[100]

---

[95] *See* Rec. 3117.
[96] *Id.*
[97] *See generally* Rec. 3118-574.
[98] *See* Rec. 2253-61.
[99] *See* Rec. 6981-82.
[100] *Id.*

78. On November 14, 2018, Plaintiffs requested an independent external review of Defendants' denials.[101]

79. As part of their external review request, Plaintiffs included a letter of medical necessity dated August 15, 2018 from Dr. Lisa Bravo, the Doctor of Behavioral Health who had previously treated I.W.[102] In the letter, Dr. Bravo reviewed I.W.'s medical history, then indicated "it is my strong opinion that [I.W.'s] treatment and level of care [at Uinta] was medically necessary."[103]

80. As part of their external review request, Plaintiffs also included all of I.W.'s medical records from her time spent at Uinta,[104] as well as selected excerpts from those records.[105]

81. Defendants submitted I.W.'s claims for external review.[106]

82. On December 18, 2018, a MAXIMUS Federal ("MAXIMUS"), an external reviewer, issued an opinion upholding the denial of I.W.'s claims.[107]

83. MAXIMUS entire rationale for upholding the denial stated:

> Per InterQual criteria 2016.3 Child and Adolescent Psychiatry Criteria Residential Treatment Center, extended stay there must be documentation within the last week of either physical altercations, sexually inappropriate behavior, evidence of worsening depression, runaway behavior, self-mutilation, suicidal or homicidal ideation. Based on the information provided in the chart, the Insured did not display any of these such behaviors within the specified time. Furthermore, she was not noted to be psychotic, manic, suicidal, homicidal, or having symptoms of a major depressive episode. There is no documentation that the Insured had significant ongoing medical problems that required hospital-based interventions or the Insured had functional impairments. There is no evidence in the

---

[101] *See* Rec. 6950-6979.
[102] *See* Rec. 7048.
[103] *Id*.
[104] *See* Rec. 7814-9414.
[105] *See* Rec. 9415-88.
[106] *See* Rec. 6790.
[107] *See* Rec. 6794-96.

> chart of any significant side effects from medication. The Insured was not reported to have any significant withdrawal symptoms from substances, nor any significant deterioration or emergence of new symptoms during her continuing inpatient hospital stay. For these reasons, the Health Plan's determination should be upheld.[108]

84. Having exhausted their prelitigation appeal obligations under the terms of the Plan and ERISA, Plaintiffs filed the instant case.[109]

## STANDARD OF REVIEW

The Court should grant summary judgment if Plaintiffs show that "there is no genuine dispute as to any material fact" and that Plaintiffs are "entitled to judgment as a matter of law."[110] When both parties to an ERISA cause of action move for summary judgment,[111] thereby effectively "stipulat[ing] that no trial is necessary, summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor."[112]

## ARGUMENT

## I.    PLAINTIFFS ARE ENTITLED TO *DE NOVO* REVIEW

The United States Supreme Court has determined that, in general, "a denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard" unless "the benefit plan

---

[108] Rec. 6796.
[109] *See generally* Complaint, ECF Doc. No. 2.
[110] Fed. R. Civ. P. 56(a).
[111] Plaintiffs anticipate that Defendants will move for summary judgment on the same day as Plaintiffs and so provide this legal standard in the interest of providing the Court with a full understanding of the scope of its review.
[112] *LaAsmar v. Phelps Dodge Corp. Life*, 605 F.3d 789, 796 (10th Cir. 2010) (citation and internal quotation marks omitted); *see also Perry v. Simplicity Engineering Div. of Lukens. Gen. Indus.*, 900 F.2d 963 (6th Cir. 1990) ("A primary goal of ERISA was to provide a method for workers and beneficiaries to resolve disputes over benefits inexpensively and expeditiously . . . . Permitting or requiring district courts to consider evidence from both parties that was not presented to the plan administrator would seriously impair the achievement of that goal. If district courts heard evidence not presented to plan administrators, employees and their beneficiaries would receive less protection than Congress intended).

gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[113] If the plan in question does vest discretionary authority in the administrator, courts instead apply a "deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious."[114]

However, even if a plan vests discretionary authority in an administrator, a defendant forfeits access to the deferential "arbitrary and capricious" or "abuse of discretion" standard of review if it fails to comply with ERISA's procedural requirements.[115] ERISA provides that, "[i]n accordance with regulations of the [Department of Labor], every employee benefit plan" is required to (1) "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant" and (2) "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim."[116] Making use of this statutory authority, in 2002 the Department of Labor established procedural regulations (the "2002 regulations") to "set[ ] forth minimum requirements for employee benefit plan procedures pertaining to claims for benefits by participants and beneficiaries."[117]

In pertinent part the 2002 regulations require that, at minimum, a plan administrator initially denying a claim for benefits must provide the claimant with information including: (1) "[t]he specific reason or reasons for the adverse determination;" (2) "[r]eference to the specific plan provisions on which the determination is based;" (3) "[a] description of any additional

---

[113] *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).
[114] *Weber v. GE Grp. Life Assurance Co.*, 541 F.3d 1002, 1010 (10th Cir. 2008) (citation and internal quotation marks omitted).
[115] *See, e.g., Rasenack v. AIG Life Ins. Co.*, 585 F.3d 1311, 1316-17 (10th Cir. 2009) (reviewing an ERISA claim *de novo* because the defendant insurance company violated the procedural requirements of ERISA).
[116] 29 U.S.C. § 1133.
[117] 29 C.F.R. § 2560.503-1(a).

material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;" and (4) for denials based on lack of medical necessity, "an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances."[118] Later regulations also provide that if an administrator fails to comply with these requirements "the claim or appeal is deemed denied on review *without the exercise of discretion by an appropriate fiduciary*" unless the procedural violations are "de minimis," occurred "for good cause or due to matters beyond the control of the plan or issuer," and do not cause prejudice or harm to the claimant.[119] This language demonstrates the Department of Labor's intention that – for all but *de minimis* harmless procedural violations, any deviation from the procedural requirements of ERISA forfeits a defendant's right to the deferential abuse of discretion standard of review and instead triggers *de novo* review.

Further, the 2002 regulations also provide that ERISA's guarantee of a "full and fair review" of a plan administrator's denial of benefits requires that the administrator provide claimants "a reasonable opportunity to appeal" through a process that must, at minimum: (1) "take[ ] into account all comments, documents, records, and other information submitted by the claimant related to the claim[;]" (2) provide "reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits[;]" and (3) in deciding an appeal based on medical necessity, demonstrate that the claim administrator "consult[ed] with a healthcare professional who has appropriate training and experience in the field of medicine involved in the medical judgment."[120] In sum, these procedures require that

---

[118]*Id.* § 2560.503-1(g)(i),(ii),(iii) and (v).
[119] 29 C.F.R. § 2590.715-2719(b)(2)(ii)(F)(1)-(2) (emphasis added).
[120] 29 CFR § 2560.503-1(h)(2)(iii)-(iv), *Id.* § 2560.503-1(h)(3)(iii).

there appeals process must represent "a meaningful dialogue between ERISA plan administrators and their beneficiaries."[121] Again, failure to comply with these minimum procedural requirements results in the claim or appeal being "deemed denied on review without the exercise of discretion by an appropriate fiduciary" unless the procedural violations are "de minimis," occurred "for good cause or due to matters beyond the control of the plan or issuer," and do not cause prejudice or harm to the claimant.[122]

Under the now outdated 2002 version of the ERISA regulations, the Tenth Circuit Court of Appeals previously held that some failures to comply with the procedural requirements of ERISA could be overlooked so long as the defendant "substantially complied" with those requirements.[123] Under that circumstance, the *Gilbertson* court held that a defendant insurance company would not forfeit its right to the abuse of discretion standard of review.[124] However, the Tenth Circuit has repeatedly noted that the 2002 regulations call this precedent into question and has expressed significant doubt that the lenient "substantial compliance" standard is still applicable to allow insurance companies to salvage procedurally defective claims processes and preserve deferential review.[125] In addition, at least one district court in the Tenth Circuit has determined "that the substantial compliance doctrine is not applicable under the [2002]

---

[121] *Gilbertson v. Allied Signal*, 328 F.3d 625, 635 (10th Cir. 2003) (citation omitted).
[122] 29 C.F.R. § 2590.715-2719(b)(2)(ii)(F)(1)-(2).
[123] *Gilbertson*, 328 F.3d at 634.
[124] *See id*. at 634-635.
[125] *See e.g., Rasenack*, 585 F.3d at 1316 (noting that "[t]he 2002 amendments have . . . called into question the continuing validity of the substantial compliance test"), *Kellogg v. Metro Life Ins. Co.*, 549 F.3d 818, 828 (10th Cir. 2008) (noting that the substantial compliance rule "was issued in light of the then-controlling 1998 federal regulations implementing ERISA" and that the 2002 regulations "have called into question the continuing validity of the substantial compliance rule"); *see also Finley v. Hewlett-Packard Co. Empl. Benefits Org. Income Prot. Plan*, 379 F.3d 1168, 1175 n.6 (10th Cir. 2004) (specifically reserving the question of whether the substantial compliance test articulated in *Gilbertson* is still applicable following the adoption of the 2002 regulations).

regulations,"[126] and that "a decision made in the absence of the mandated procedural protections should not be entitled to any judicial deference."[127]

Further, the Second Circuit Court of Appeals has rejected *Gilbertson's* "substantial compliance" doctrine outright, determining it to be "flatly inconsistent" with the language in the 2002 version of the claims procedure regulations.[128] In reaching this conclusion, the Second Circuit noted that when revising the regulations in 2002 the Department of Labor specifically rejected requests from commenters to the proposed changes in the claims procedure regulations who sought to preserve the substantial compliance concept outlined in *Gilbertson* and other cases.[129]

Not every failure to comply with ERISA's claims procedure regulations results in *de novo* review under *Halo*. Minor deviations are tolerable so long as the ERISA plan shows it has procedural integrity and the errors that occur are harmless and inadvertent:

> [W]e hold that when denying a claim for benefits, a plan's failure to comply with the Department of Labor's claims-procedure regulation, 29 C.F.R. §2560.503-1, will result in that claim being reviewed *de novo* in federal court, **unless the plan has otherwise established procedures in full conformity with the regulation and can show that its failure to comply with the claims-procedure regulations in the processing of a particular claim was inadvertent and harmless.** Moreover, the plan "bears the burden of proof on this issue since the party claiming deferential review should prove the predicate that justifies it."[130]

Similar to §2590.715-2719, the Second Circuit approach does not impose strict liability on insurers and plan administrators for failing to meticulously follow ERISA's procedural regulations. Rather, its analysis requires that claimants identify some aspect of the claims

[126] *Reeves v. UNUM Life Ins. Co.*, 376 F. Supp. 2d 1285, 1293 (W.D. Okla. 2005).
[127] *Id*. at 1294 (citation and internal quotation marks omitted).
[128] *Halo v. Yale Health Plan*, 819 F.3d 42, 56 (2nd Cir. 2016).
[129] *Id.* at 57
[130] *Id.* at 57-58 (emphasis added, citations omitted)

procedure regulations that have been violated. Only then does the burden of proving both inadvertence and lack of harm shift to the plan or claim administrator. This careful balancing of legitimate interests emphasizes the importance of ERISA regulations and increases the likelihood that plan participants and beneficiaries will receive a fair and full review of their claims. Other courts have followed the Second Circuit and adopted the *Halo* rationale.[131]

The procedural irregularities Defendants engaged in while determining benefits for I.W. were not advertent or minor, nor were they harmless. Furthermore, even if the Court is not inclined to adopt the Second Circuit's analysis in *Halo*, Defendants are still not entitled to arbitrary and capricious review because they have not substantially complied under the doctrine established by *Gilbertson*. Defendants have failed to comply with the procedural requirements of ERISA for at least six reasons.

First, Defendants failed to comply with the procedural requirements of ERISA because they did not consult with a medical professional who had appropriate training and experience in the field of medicine involved in determining that I.W.'s care was not medically necessary (which would have been child behavioral health or psychiatry). Indeed, Defendants' July 16, 2018 denial letter (the only denial letter Defendants issued in response to an appeal by Plaintiffs') indicated that its review had been conducted by  an unnamed Arizona physician "board certified in Obstetrics and Gynecology."[132] Per the 2002 regulations, consulting with an appropriately trained and experienced medical professional represented the bare minimum necessary to provide Plaintiffs with a full and fair review of I.W.'s claims. Accordingly, this

---

[131] *See, e.g.*, *Otero v. Unum Life Ins. Co. of Am.*, 226 F.Supp.3d 1242, 1265 (N.D. Ala. 2017) (referencing the Second Circuit's "thorough, well-reasoned" analysis of the issue) and *Johnston v. Aetna Life Ins. Co.*, 2018 U.S. Dist. LEXIS 34622, *35 (S.D. Fla. 2018) (commenting on the "detailed analysis of the regulation's ambiguity, timing, and history").
[132] *See* Rec. 6981-82.

failure alone demonstrates that even under the substantial compliance standard Defendants have forfeited any right they might claim to the Court's deference, warranting *de novo* review.

Second, Defendants also independently failed to comply with the procedural requirements of ERISA because they failed to reveal the identity and relevant credentials of the reviewers who made the medical necessity determinations central to Defendants' denials – indeed, the Obstetrician/Gynecologist Defendants relied on for their second denial letter was anonymous.[133]

Third, Defendants did not apply the Plan's terms to I.W.'s specific medical circumstances in explaining Defendants' rationale for denying I.W.'s claims – Defendants' rationale was solely based on their framing of the "InterQual" Criteria, Defendants did not explain or apply the terms of the Plan.[134]

Fourth, Defendants did not demonstrate that they had taken any of the information Plaintiffs submitted during their appeals into account – notably, the language of Defendants' second denial is virtually identical to the language of Defendants' first and does not meaningfully discuss or reference the records Plaintiffs submitted.[135]

Fifth, Defendants made no attempt to engage in a "meaningful dialogue" with Plaintiffs concerning Defendants' denials – again, this is evident by the fact that Defendants' second denial uses language that is virtually identical to Defendants' first.[136]

Sixth and finally, Defendants made no attempt to describe any additional material or information that would be necessary to perfect I.W.'s claims.[137]

---

[133] *See id.*
[134] *See* Rec. 0105-11, 6981-82.
[135] *See id.*
[136] *See id.*
[137] *See id.*

As with Defendants' failure to consult with an appropriate medical professional, the 2002 regulations establish that, at bare minimum, Defendants were required to fulfill each of the above requirements in order to comply with ERISA. Defendants were not entitled to arbitrarily choose not to comply with these requirements. However, Defendants' denial letters simply do not reflect a reasoned application of the Plan's language to the information Defendants had about I.W.'s medical history. Further, as the Tenth Circuit has noted, "[f]iduciaries cannot shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement and when they have little or no more evidence in the record to refute that theory."[138] Defendants gave no indication in their denials that they had considered the substance of Plaintiffs' arguments or meaningfully engaged with the information they were presented about how I.W.'s mental health disorders satisfied the Plan's medical necessity criteria. Accordingly, for each of the six identified reasons, the Court should review Defendants' denial of I.W.'s claims *de novo*.

## II.   UNDER ANY STANDARD OF REVIEW, DEFENDANTS WRONGFULLY DENIED BENEFITS TO I.W.

Plaintiffs contend that the Court should apply the *de novo* standard of review to Defendants' denials. However, even if the Court is inclined to apply the abuse of discretion standard of review, Plaintiffs are still entitled to the Court's reversal of Defendant's decision and reinstatement of Plaintiffs' benefits. As the Tenth Circuit has recently emphasized, the abuse of discretion standard of review is "not without meaning."[139] Where a claim administrator's decision is not supported by substantial evidence "based upon the record as a whole," with the court taking into account "whatever in the record fairly detracts from its weight," the court

---

[138]*Gaither v. Aetna Life Ins. Co.,* 394 F.3d 792, 807 (10th Cir. 2004).
[139] *McMillan v. AT&T Umbrella Benefit Plan No. 1*, 746 F. App'x 697, 705 (10th Cir. 2018).

should determine that the administrator's decision was arbitrary and capricious.[140] Additionally, the Court's abuse of discretion review should account for the fact that the claim administrator, acting as a fiduciary "must discharge its duties with respect to discretionary claims decisions solely in the interests of the participants and beneficiaries of the plan . . . and consistent with this standard of care must provide a full and fair review of claim denials."[141]

Defendants have failed to meet these obligations in several ways. First and foremost, Defendants abused their discretion because I.W.'s treatment was medically necessary under the terms of the Plan and Defendants deviated from those terms and ignored all of Plaintiffs' evidence establishing that point. Second, Defendants abused their discretion when they completely disregarded the opinions of I.W.'s treating providers and did not engage with those opinions during the appeals. Third and finally, Defendants abused their discretion when they did not articulate how they were applying the terms of the Plan to I.W.'s medical history. For each of these independent reasons, the Court should reverse Defendants' denials.

**A. Defendants Abused Their Discretion Because I.W.'s Treatment Was Medically Necessary Under the Terms of the Plan and the InterQual Criteria.**

I.W.'s medical records and behavioral history show that her treatment was medically necessary. The Plan defines medically necessary services as those that are:

> health care services that a Physician, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an Illness, Injury, disease or its symptoms, and that are:

---

[140] *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1134 (10th Cir. 2011) (citation and internal quotation marks omitted).

[141] *Raymond M. v. Beacon Health Options, Inc.*, 463 F. Supp. 3d 1250, 1266 (D.Utah 2020) (brackets, citations, and internal quotation marks omitted) (holding that a similarly situated claim administrator acted arbitrarily and capriciously in denying benefits for mental health and substance use disorders).

1. In accordance with generally accepted standards of medical practice;
2. Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's Illness, Injury or disease; and
3. Not primarily for the convenience of the patient, Physician, or other health care Provider, and not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's Illness, Injury or disease.

For these purposes, "generally accepted standards of medical practice" means standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, Physician Specialty Society recommendations, the views of Physicians practicing in relevant clinical areas and any other relevant factors.

The fact that a Provider may prescribe, order, recommend or approve a treatment, service, supply or medicine does not in itself make the treatment, service, supply or medicine Medically Necessary.[142]

Further, per the InterQual Criteria, in the case of a patient with an "Eating Disorder," continued care at a residential treatment facility is medically necessary if any of the following were found to apply to the patient:[143]

...
- Unable to make appropriate food choices without assistance or supervision at all meals
...
   o Attempting to restrict at meals even when supervised by staff

---

[142] Rec. 0345.
[143] *See* Rec. 0032-37.

> …
> o  Food refusal or persistent decline
>    in oral intake
> … [or]
> o  Restricting at meals when not
>    supervised[.]
> …[144]

With respect to patients experiencing a "[s]erious emotional disturbance," the InterQual criteria provide that continued care at a residential treatment facility is medically necessary if any of the following apply to the patient:[145]

> …
> •  Easily frustrated and impulsive
> …
> •  Persistent rule violations
> … [or]
> •  Sexually inappropriate
> …[146]

The Plan further provides that continued care at a residentially treatment facility is medically necessary if a patient is "[u]nable to establish positive peer or adult relationships[.]"[147]

In its recent decision in *Wit v. United Behavioral Health*, the Northern District of California further elaborated on generally accepted standards of mental health care and held that "[i]t is a generally accepted standard of care that the determination of the appropriate level of care for patients with mental health and/or substance use disorders should be made on the basis of a multidimensional assessment that takes into account a wide variety of information about the patient."[148]  The court in *Wit* also explained the differences between levels of mental health treatment, particularly, the differences between residential and acute inpatient treatment:

---

[144] *See* Rec. 0037.
[145] *See* Rec. 0032-37.
[146] *See* Rec. 0037-38.
[147] *See* Rec. 0038.
[148] 2019 U.S. Dist. LEXIS 35205, at *84.

[I]n the area of mental health and substance use disorder treatment, there is a continuum of intensity at which services are delivered. In the most extreme situations, where a patient poses an imminent risk of serious harm to self or others, a provider will recommend inpatient hospitalization...The focus of treatment at this level of service is crisis stabilization, that is, to address the acute crisis so that the patient can be moved to a lower level of care where the patient 'can get back to doing the work that needs to happen over time" to address the 'drivers of the recurrent risk of crisis.'

The next level of intensity below inpatient hospitalization is residential treatment. Residential treatment is for individuals who do not pose an imminent risk of serious harm to self or others (i.e., who do not need inpatient hospitalization), but rather, 'because of specific functional limitations, need safe and stable living environments and 24-hour care'…  At this level of care, treatment is not limited to addressing acute symptoms to achieve crisis stabilization; instead, it is designed to provide patients with an 'opportunity to engage underlying chronic, recurrent, comorbid issues' so that they are able to 'turn a corner' and move to a lower level of service intensity.[149]

In this case, I.W.'s struggles with self-harm, depression, anxiety, anorexia, and suicidal ideation began in 2013, three years before she began to receive treatment at Uinta.[150] During 2016 alone, I.W. was discovered to have attempted suicide five times.[151] Eight days before Defendants determined I.W. did not need further treatment at Uinta, I.W. was discovered to have been abusing cough syrup to get high – an event that caused her clinician to note that she was "in relapse" and would not be safe if she returned home.[152] In the months that followed Defendants decision to deny I.W.'s claims, I.W. continued to attempt to restrict her food intake (eventually necessitating that she be monitored at arms-length by her treatment team during her meals – a level of oversight that I.W.'s providers maintained for months after Defendants' denied

---

[149] *Id.* at *62-64 (N.D. Cal. 2019) (emphasis added) (internal citations omitted).
[150] *See* Rec. 7022-37, 7048.
[151] *See* Rec. 7048.
[152] *See* Rec. 3393, 3397.

continuing coverage),[153] engaged in a sexually inappropriate relationship with a peer that she refused to break off,[154] relapsed to prior bad behaviors during a home visit,[155] continued to struggle to manage her symptoms of anxiety and depression,[156] and continued to struggle with relapse behaviors as late as October of 2017.[157]

On their face, under both the terms of the Plan and the InterQual Criteria, these symptoms demonstrate that it was medically necessary for I.W. to continue to receive mental health care after February 22, 2017. "It is a generally accepted standard of care that effective treatment requires treatment of co-occuring behavioral health disorders and/or medical conditions in a coordinated manner that considers the interactions of the disorders and conditions and their implications for determining the appropriate level of care."[158] Moreover, effective mental health treatment does not only focus on alleviating current symptoms, but also treating "chronic underlying conditions."[159] In this light, it is particularly relevant that the InterQual Criteria instruct that continued care at a residential treatment center is medically necessary if a patient: (1) restricts at meals if they are not supervised; (2) attempts to restrict at meals even when supervised by staff; (3) refuses food; (4) engages in persistent rules violation; (5) is easily frustrated or impulsive; (6) engages in sexually inappropriate behavior; or (7) is not able to establish positive peer or adult relationships. I.W.'s medical records, which were submitted to Defendants along with Plaintiffs' appeal,[160] amply demonstrate that I.W. displayed all of these

---

[153] *See* Rec. 2989, 3129, 3163, 3173, 3183-84, 3192, 3197, 3290, 3330, 3342, 9470.
[154] *See* Rec.  3140, 3263, 3335, 3340, 3350.
[155] *See* Rec. 3267, 3272, 3286.
[156] *See generally* Rec. 7814-9414; *see also* Rec. 3157-58.
[157] *See* Rec. 9476-80.
[158] *Wit*, 2019 U.S. Dist. LEXIS 35205, at *71
[159] *Id.* at *69
[160] *See* Rec. 7814-9414.

behaviors for months following February 22, 2017. Accordingly, Defendants acted arbitrarily and capriciously by denying I.W.'s claims as of that point.

Moreover, Plaintiffs' note that Defendants denial rationale relied on Defendants' misstatement of the InterQual Criteria. In both of their denial letters, Defendants indicated that coverage for I.W.'s care was denied after February 22, 2017 because: "InterQual criteria standards state that there must be reports within the last week of either physical altercations, sexually inappropriate behavior, evidence of worsening depression, runaway behavior, self-mutilation, suicidal or homicidal ideation."[161] This framing truncates and distorts the actual InterQual Criteria for continued care at a Residential Treatment Center like Uinta, which provide that continued treatment is medically necessary in a much broader range of circumstances.

Defendants' incorrect framing of the InterQual Criteria was particularly inappropriate because Defendants appear to have cherrypicked symptoms they did not believe I.W. was manifesting (i.e. "runaway behavior," and "homicidal ideation") while ignoring symptoms they knew she was (i.e. continuing to struggle with her eating disorder, persistently breaking Uinta's rules, struggling to form healthy relationships with her peers). Defendants acted arbitrarily and capriciously by deviating not only from the Plan's definition of medical necessity, but also from the InterQual Criteria that Defendants purportedly relied on to evaluate whether I.W.'s care was medically necessary.

Further, Plaintiffs note that the record does not reveal any basis for Defendants' determination that February 22, 2017, of all days, was the last appropriate day to cover I.W.'s treatment at Uinta. Eight days prior, I.W. had been caught drinking cough syrup to get high.[162] Five days after February 22nd, I.W.'s treatment team discovered that I.W. had engaged in, and

---

[161] *See* Rec. 0105-11, 6981-82.
[162] *See* Rec. 3397.

then concealed, an inappropriate sexual relationship with a peer.[163] Three days later, on March 1, I.W.'s clinician expressed concern that I.W. was finding ways to restrict her food intake and instructed her treatment team to increase their oversight during I.W.'s meals.[164] That same day, the clinician noted that I.W. was displaying symptoms of anxiety and depression.[165] In the months that followed, I.W. would continue to display symptoms that clearly justified continued care under the InterQual Criteria.[166]

Given this context, Defendants' selection of February 22, 2017 as the last date for which benefits would be paid on I.W.'s claim appears to be entirely arbitrary. As this Court has previously warned, it is "inappropriate" for a claim administrator to arbitrarily and prematurely choose to deny coverage after a particular date in the absence of some justification from the record.[167] The Court should find that Defendants' decision to deny coverage after February 22, 2017 was arbitrary and capricious.

In addition, "[w]hile effective treatment may result in improvement in the patient's level of functioning, it is well-established that effective treatment also includes treatment aimed at preventing relapse or deterioration of the patient's condition and maintaining the patient's level of functioning."[168] Many treating clinicians determined that I.W.'s chronic underlying conditions and propensity towards relapse could not be treated without further care at a residential treatment center.[169] Defendants' denial rationale deviated wildly, and inexplicably, from both the Plan's

---

[163] *See* Rec. 3350.
[164] *See* Rec. 3342.
[165] *See id*.
[166] *See supra* Facts Nos. 43-71.
[167] *Charles W. v. Regence BlueCross BlueShield of Or.*, 2019 U.S. Dist. LEXIS 167184, *26-32 (D.Utah 2019).
[168] *Id*. at *79; *see also S.B. v. Oxford*, 419 F. Supp. 3d at 360 (holding that a claim administrator had erred when it "focused on the stabilization of [a plaintiff's] acute symptoms" and the plaintiff's "immediate safety" over a treating team's concerns about the "likely ineffectiveness of treating [the Plaintiff's] underlying [ ] disorder at lower levels of care.")
[169] *See* Rec. 3158, 3393, 9480.

explanation of medical necessity and from the conclusions drawn by I.W.'s clinicians who offered their professional medical opinions concerning her needs.[170]

The information demonstrating that I.W.'s mental health care was medically necessary was available to Defendants. Indeed, Plaintiffs asked Defendants to review this information and specifically provided authorization to facilitate Defendants' review of I.W.'s medical records.[171] Nothing prevented Defendants from doing a thorough and competent evaluation of the medical necessity of I.W.'s treatment, but there is little in the Record to reflect that Defendants ever carried out that review despite Plaintiffs' requests that they do so and despite the Tenth Circuit's mandate that Defendants could not "shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement [to benefits]."[172] By failing to address I.W.'s medical records, Defendants acted arbitrarily and capriciously and fell short of their fiduciary obligation.

Because I.W.'s treatment was medically necessary under the terms of the Plan and the InterQual Criteria, because Defendants misrepresented the InterQual Criteria to come to the opposite conclusion, because Defendants' selection of February 22, 2017 as the last date of coverage was arbitrary, and because Defendants did not meaningfully engage with I.W.'s medical history demonstrating that her treatment was medically necessary, the Court should reverse Defendants' denials of I.W.'s claims.

### B. Defendants Abused Their Discretion When They Disregarded and Did Not Engage with the Opinions of I.W.'s Treating Professionals

In their appeals, Plaintiffs included one letter from a professional who had treated I.W. and several medical records reflecting the opinions of I.W.'s clinician and treatment team, all of

---

[170] *See* Rec. 0105-11, 6981-82.
[171] Rec. 0539-96, 0646-52, 2721-59.
[172] *Gaither*, 394 F.3d at 807.

which indicated that I.W.'s treating professionals believed it was medically necessary for I.W. to receive more residential treatment.[173] Defendants did not acknowledge these letters and did not address them in any of Defendants' denials.[174] As noted previously, Defendants were not entitled to cherry-pick only the evidence that supported their conclusion from the Record, nor were they entitled to "shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement [to benefits]."[175] Indeed, the Supreme Court has noted that similarly situated defendants are not entitled to "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."[176] Treating physicians have a "greater opportunity to know and observe the patient as an individual compared to individuals who have not examined the patient and are simply reviewing medical records."[177]

The Tenth Circuit has applied the principles in *Nord* specifically to cases involving an abuse of discretion standard of review.[178] Even before *Nord* was decided, the Tenth Circuit held that un-refuted evidence or testimony presented by a claimant in the pre-litigation claim and appeal process may not be disregarded by an ERISA plan administrator.[179] "Testimony as to a simple fact capable of contradiction, not incredible, and standing uncontradicted, unimpeached… must be taken as true... "Un-impeached credible evidence may not be disregarded by the trier of fact" as Defendants did here.[180]

---

[173] *See* Rec. 3158, 3393, 7048, 9480.

[174] *See* Rec. 0105-11, 6981-82.

[175] *Gaither*, 394 F.3d at 807.

[176] *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).

[177] *Id*. See also, *Westphal v. Eastman Kodak Co.*, 2006 U.S. Dist. LEXIS 41494, *13 (W.D.N.Y. 2006) ("There can be no serious doubt that a psychiatric opinion based on a face-to-face interview with the patient is more reliable than an opinion based on a review of a cold, medical record")

[178] *Rasenack*, 585 F.3d at 1325-1326; *Fought,* 379 F.3d at 1000, n.1.

[179] *Gaylor v. John Hancock Mut. Life Ins. Co*., 112 F.3d 460, 467-468 (10th Cir. 1997).

[180] *Id.*

It is especially improper to ignore the findings and conclusions of a patient's treating physicians when dealing with the care of individuals who have mental, behavioral, or emotional conditions. When the information from a medical record arises out of an examination of a mental health patient, the treating physician is in a better position to evaluate and come to valid conclusions about the symptoms and diagnoses of a patient than a record reviewer.[181] Defendants cannot "cherry-pick[] the information contained in the Record…helpful to [their] decision to deny" coverage for I.W.'s treatment.[182]

Because of this, Defendants' refusal to acknowledge or address the opinions of I.W.'s treating professionals was arbitrary and capricious, and the Court should reverse Defendants' denials of I.W.'s claims.

### C.  Finally, Defendants Abused Their Discretion When They Did Not Apply Any Specific Terms of the Plan to Any Specific Portion of I.W.'s Medical Records.

At no point in any of Defendants' denials did Defendants cite to specific provisions of the Plan, specific portions of I.W.'s medical records, or any reports conducted by Defendants' medical professionals that may have formed the basis for Defendants' denials of coverage.[183] Sister courts in the District of Utah have previously ruled that "an ERISA plan fiduciary's failure to utilize the proper plan language or criteria in evaluating whether a plan beneficiary is entitled to benefits is an abuse of discretion."[184] Other District of Utah Judges have ruled that when a claim administrator's denial letters "contain neither citations to the medical record nor references to the reports by [the defendants'] doctors" concerning a claimant's condition but are instead composed of "conclusory statements without factual support," the denial is arbitrary and

---

[181] *Rasenack*, 585 F.3d at 1325; *Westphal,* 2006 U.S. Dist. LEXIS 41494, *13

[182] *Rasenack,* 585 F.3d. at 1326.

[183] *See generally* Rec. 0447-56, 0474-84, 1617-26, 1672-81, 1682-92, 1693-1702, 2305-2315, 2525-2534.

[184] *James F. ex rel. C.F. v. Cigna Behavioral Health, Inc*., 2010 U.S. Dist. LEXIS 136134 *17 (D. Utah 2010) (Kimball, J.)

capricious.[185] Because Defendants did not explain any of the factual findings to support their denials and did not even articulate Plan provisions under which they denied coverage for I.W.'s treatment, the Court should reverse Defendants' denials.

## III.   THE COURT SHOULD ORDER DEFENDANTS TO PAY FOR THE TREATMENT I.W. RECEIVED AT UINTA.

In the event that the Court grants Plaintiffs' Motion for Summary Judgment, the Court should not remand Plaintiffs claims back to Defendants but instead should enter judgment in Plaintiffs' favor and order Defendants to pay for the treatment I.W. received at Uinta. This is because, while ERISA treats plan administrators as somewhat analogous to administrative agencies during a claimant's prelitigation appeals, the text of ERISA itself "does not contain any provisions governing remands to plan administrators once those actions have been initiated, nor does it explain how judicial review of determinations made on remand is to occur."[186] This strongly contrasts with the regulatory frameworks governing *actual* administrative agencies, and as courts in other districts have noted, runs a significant and problematic risk of creating an unfair "heads we win; tails, let's play again" system of benefits adjudication in favor of defendant insurance companies.[187]

Further, remanding this case to Defendants would likely run afoul of the Article III of the United States Constitution's language prohibiting federal courts from issuing advisory judicial opinions as opposed to final judgments of conclusive character on meritorious civil actions.[188] As

---

[185] *Raymond M.*, 463 F. Supp. 3d at 1282; *see also Kerry W. v. Anthem Blue Cross & Blue Shield*, 444 F. Supp. 3d 1305, 1313 (D. Utah 2020) (holding that claim administrator's denial of coverage was "arbitrary and capricious" where the administrator "did not offer any responses to the diagnoses and reports" included in a claimant's appeals and "did not cite any reports by [the claim administrator's] doctors or by doctors at [the treatment facility] on which they relied on reaching their conclusions.")

[186] *Mead v. Reliastar Life Ins. Co.*, 768 F.3d 102, 112 (2nd Cir. 2014).

[187] *Tam v. First Unum Life Ins. Co.*, 2020 U.S. Dist. LEXIS 186477 (C.D. Cal. 2020) (citation and internal quotation marks omitted).

[188] *See* U.S. Const. Art. III.

the Supreme Court noted in *Aetna Life Insurance Co. v. Haworth*, "[w]here there is [ ] a concrete case admitting of an immediate and definitive determination of the legal rights of the parties" in the context of a civil dispute over insurance benefits, the case may be appropriately resolved by an declaratory judgment addressing the dispute.[189]

However, in the event that the Court does decide to remand I.W.'s claims for a second review by Defendants, the Court should limit Defendants' potential bases for denial to those discussed in their denial letters in the pre-litigation appeal process. Federal appellate courts have repeatedly recognized that such a restriction is permissible,[190] and in *Wit v. United Behavioral Health* a sister court in a neighboring district recognized that in this context such a limitation is necessary to ensure that any remand is appropriately cabined to the issues that were litigated during a Plaintiffs' ERISA claim.[191] Accordingly, the Court should limit any remand to the bases for denial that Defendants already articulated in their prelitigation denial letters.

## IV.   THE PLAINTIFFS ARE ENTITLED TO AN AWARD OF PREJUDGMENT INTEREST AND ATTORNEY FEES AND COSTS

In the event that the Court grants Plaintiffs' Motion for Summary Judgment, they request an award of attorney fees and costs based on 29 U.S.C. §1132(g) as the prevailing party in this litigation. Plaintiffs request the opportunity to present in a future briefing additional information demonstrating why an award of prejudgment interest, attorney fees, and costs is appropriate.

//

//

//

---

[189] 300 U.S. 227, 241-44 (1937).
[190] *See, e.g., Harlick v. Blue Shield of California*, 686 F.3d 699, 719 (9th Cir. 2012) ("[A] contrary rule would allow claimants, who are entitled to sue once a claim has been 'deemed denied' to be 'sandbagged' by a rationale the plan administrator adduces only after the suit has commenced." (citation and internal quotation marks omitted)).
[191] *See Wit v. United Behavioral Health*, 2020 U.S. Dist. LEXIS 205435, **96-100 (N.D. Cal. November 3, 2020) (imposing restrictions on United Behavioral Health when remanding erroneously decided ERISA claims).

## <u>CONCLUSION</u>

For all of the foregoing reasons, the Court should grant Plaintiffs' Motion for Summary

Judgment and award benefits to Plaintiffs for the care I.W. received at Uinta.

Dated this 26th day of February, 2021.

/s/ Brian S. King
Attorney for Plaintiffs

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served to

all parties registered to receive Court notices for the above captioned case through the Court's

CM/ECF System.

Dated this 26th day of February, 2021.

/s/ Brian S. King