Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
BRIAN S. KING PC
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| E.W. and I.W.,<br><br>        Plaintiffs,<br>vs.<br><br>HEALTH NET LIFE INSURANCE COMPANY, and HEALTH NET OF ARIZONA, INC.<br><br>        Defendants. | OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br><br><br><br><br>Civil No. 2:19-cv-00499-TC-DBP |

Plaintiffs E.W. and I.W. (collectively, "Plaintiffs"), through their undersigned counsel, hereby submit their opposition to Defendants Health Net Life Insurance Company and Health Net of Arizona, Inc.'s (collectively, "Defendants") Motion for Summary Judgment.

## **INTRODUCTION**

After struggling for years with major depressive disorder, anxiety, anorexia, and impulses to self-harm – which collectively led to at least five suicide attempts requiring hospitalization – Plaintiff I.W. received care at Uinta Academy ("Uinta"), a residential treatment center specializing in providing mental health care to adolescents. Defendants partially denied coverage

for that treatment, contending that I.W.'s care was not medically necessary after February 22, 2017.

In doing so, Defendants consistently maintained that they were relying on the InterQual Criteria, a set of mental health treatment criteria that various organizations employ to evaluate the medical necessity of particular treatments. However, the record does not reflect that Defendants actually used the InterQual Criteria to evaluate the medical necessity of I.W.'s care. Instead, while the InterQual Criteria describe a lengthy list of symptoms justifying continued treatment – many of which applied to I.W. and established that it was medically necessary for her to continue to receive care – Defendants elected to base their denials on a cherry-picked list of seven symptoms that they believed I.W. did not have, ignoring the multitude of symptoms that she did.

Because the record shows that I.W.'s treatment was medically necessary, because Defendants did not actually adhere to any set of valid criteria in denying I.W.'s treatment, and because Defendants repeatedly acted arbitrarily and capriciously by ignoring the opinions of I.W.'s treating professionals and failing to apply the terms of the Plan to I.W.'s specific medical needs, the Court should deny Defendants' motion.

## PLAINTIFFS' RESPONSES TO DEFENDANTS' ALLEGEDLY UNDISPUTED MATERIAL FACTS

In responding to Defendants' allegedly undisputed material facts, Plaintiffs only respond to the facts that are in dispute for purposes of this opposition. As a preliminary matter, Plaintiffs note that Defendants appear to have fundamentally misunderstood the permissible scope of the Court's review when considering cross-motions for summary judgment related to Plaintiffs' ERISA cause of action. As Plaintiffs discuss more fully below,[1] when parties cross-move for

---

[1] *See* Standard of Review, *infra.*

summary judgment on an ERISA cause of action the Court's review is limited to the information contained in the administrative record. Despite this, Defendants repeatedly attempt to use affidavits and exhibits to both: 1) insert more favorable facts into the record; and 2) contradict or "fix" unfavorable facts in the record.[2] All of these extra-record assertions of fact are outside of the appropriate standard of review in this case, and Defendants' repeated attempts to introduce them are improper. The Court should comprehensively disregard all of the extra-record facts Defendants attempt to introduce, including by disregarding every affidavit and exhibit Defendants attached to their Motion.

11. The case manager forwarded the file to an MHN Senior Medical Director, Dr. Andrei Jaeger, who instructed MHN to conduct a peer-to-peer review concerning I.W.'s level of care. A.R. 136-37; *see also* Ex. 1 ¶¶ 4-5 (Aff. of Dr. Andrei Jaeger). Dr. Jaeger approved Prest & Associates ("Prest"), one of the country's oldest and most respected psychiatric and behavioral health independent review organizations, to conduct the review. A.R. 138; Ex. 1 ¶ 6.

**Plaintiffs' Response:** The scope of the Court's review is limited to the administrative record. As such, Defendants' attempt to add more favorable facts to the record through the introduction of extra-record evidence is wholly improper. The Court should entirely disregard the affidavit of Dr. Andrei Jaeger, as well as every other affidavit and exhibit Defendants appended to their motion, and should afford no weight to any of Defendants' assertions of fact that are not supported by the administrative record.

With that in mind, there is no evidence in the record supporting Defendants' characterization that Prest & Associates is "one of the country's oldest and most respected psychiatric and behavioral health independent review organizations." If Defendants wanted that

---

[2] *See generally* Defendants' Statement of Undisputed Material Facts, contained in Defendants' Motion for Summary Judgment ("Defendants' MSJ"), filed under seal with the Court.

assertion to be part of the administrative record, they had every opportunity to include it. They did not, and accordingly, the Court should disregard that assertion here. For what it's worth, the experience of Plaintiffs' counsel over twenty plus years is that Prest & Associates is the most reliable external resource employers and insurers use to rubber-stamp egregiously wrongful claim denials in an effort to further their immediate economic interests and betray their fiduciary duties to ERISA plan participants and beneficiaries that they receive the benefits to which they are entitled under the terms of their plans. But for purposes of the parties' Motions for Summary Judgment, their two disparate characterizations of Prest & Associates should be given equal weight: zero.

14. InterQual Criteria specify that to justify a residential treatment level of care beyond fifteen days, there must be reports within the past week of symptoms or behaviors such as (i) evidence of physical altercations, such as assaultive behavior or destruction of property; (iv) evidence of worsening depression or anxiety; (v) sexually inappropriate behavior; (vi) runaway behavior; (vii) nonsuicidal self-injury; or (viii) suicidal or homicidal ideation.

**Plaintiffs' Response:** Plaintiffs do not dispute that the language of paragraph 14 is accurate. But Plaintiffs dispute Defendants' suggestion that their characterization of the InterQual Criteria is complete or that the Defendants accurately applied them to the I.W.'s care at Uinta. In fact, in paragraph 14 the Defendants omit the overwhelming majority of the applicable portion of the InterQual Criteria. In the following reproduction of the pertinent InterQual Criteria, the non-italicized text represents the sole portions of the criteria that Defendants elected to include in their articulation. All of the italicized, underlined text is text Defendants chose to omit. With that in mind, the InterQual Criteria specify that residential

treatment is justified beyond fifteen days if there is a "[f]inding present within last week" of one

or more of the following:[3]

- *Eating Disorder,* **Both:**
  - *Symptom, ≥ One:*
    - *Pronounced body image distortion*
    - *Unable to judge amount of food to eat at all meals*
    - *Unable to make appropriate food choices without assistance or supervision at all meals*
    - *Unachieved prescribed weight or behaviors to prevent weight gain, ≥* **One:**
      - *Attempting to restrict at meals even when supervised by staff*
      - *Discarding food from most meals*
      - *Excessive or compulsive exercising without external limits*
      - *Food refusal or persistent decline in oral intake*
      - *Sabotage of weight measurement*
      - *Self-induced vomiting after meals when not supervised*
      - *Weight gain less than 2 lb (0.9 kg) per week and consuming prescribed calories for therapeutic weight gain*
      - *Weight loss and weight 75 to 80% (0.75 to 0.80) IBW*
    - *Uncontrolled ritualistic or compulsive eating behavior at all meals.*
  - *Engagement in treatment and progress,* **All:**
    - *Attendance at least 90% (0.90) required programming*
    - *Clinical improvement,* **One:**
      - *Demonstrated within last 2 weeks*
      - *No improvement and less than 2 weeks since admission*
    - *Demonstrates motivation to change*
  - *Serious emotional disturbance,* **Both:**
    - *Symptom, ≥ One:*
      - Aggressive or assaultive behavior
      - *Angry outbursts*
      - *Depersonalization or derealization*
      - Destruction of property
      - *Easily frustrated and impulsive*
      - Homicidal ideation *without intent*
      - *Hypervigilance or paranoia*
      - Nonsuicidal self-injury
      - *Persistent rule violations*
      - *Psychiatric medication refractory or resistant and symptoms increasing or persisting, ≥* **One:**
        - *Anxiety and associated symptom*

---

[3] The following excerpt has been edited slightly to preserve the structure (but not specific symbols associated with each tier of bullets) of the bulleted list used in the InterQual Criteria. Endnotes have been omitted.

- o *Depressive disorder or major depressive episode and associated symptoms*
- o *Hypomanic symptom*
- o *Obsessive or compulsive disorder*
- o *Psychosis and associated symptom*
- *Psychomotor agitation or retardation*
- Runaway from facility or while on home pass
- Sexually inappropriate
- Suicidal ideation *without intent*
- *Symptom improved and discharge planned within next week, ≥ **One:***
  - o *Family or guardian requires further intervention and return to family planned*
  - o *Treatment goals not met*
- *Functioning, ≥ **One:***
  - o *Age 6 thru 12 and school refusal or daily resistance to school attendance*
  - o *Interpersonal conflict, ≥ **One:***
    - ▪ *Hostile or intimidating in most interactions*
    - ▪ *Persistently argumentative when given direction*
    - ▪ *Poor or intrusive boundaries causing anger in others and requiring frequent staff intervention*
    - ▪ *Threatening*
    - ▪ *Unable to establish positive peer or adult relationships*
  - o *Improved independent functioning, **Both:***
    - ▪ *Discharge planned within next week*
    - ▪ *Therapeutic passes planned to transition to alternate level of care*
  - o *Repeated privilege restriction or loss of privileges*
  - o *Unable or unwilling to follow instructions or negotiate needs*
  - o *Unresponsive to staff direction or limits[4]*

Defendants' identification of the InterQual Criteria is not an accurate representation of the actual InterQual Criteria that was applicable to I.W.'s treatment.

15. MHN Vice President and Senior Medical Director Jay Butterman, a practicing psychiatrist, reviewed Dr. Antonacci's findings, along with I.W.'s MHN case records and Uinta medical records. A.R. 140-42.

---

[4] Rec. 0036-38.

**<u>Plaintiffs' Response:</u>** The portions of the record Defendants cite do not support Defendants' characterization that Jay Butterman is "MHN Vice President and Senior Medical Director" or that he is "a practicing psychiatrist."[5] Accordingly, Plaintiffs dispute both. The Court should not permit Defendants to retroactively insert information into the record, whether through unsupported bald allegations (as here) or through the use of impermissible extra-record evidence (as throughout Defendants' motion).

16. Dr. Butterman agreed with Dr. Antonacci's findings.  On March 1, 2017, Health Net sent a letter to Plaintiffs under Dr. Butterman's signature stating: . . .

**<u>Plaintiffs' Response:</u>** Plaintiffs dispute that this letter was ever sent by Defendants (or received by Plaintiffs) prior to May of 2018, after Plaintiffs informed Defendants that they had never received a denial letter.[6] Notably, there is no evidence in the administrative record indicating that Plaintiffs' 2018 representation that they had not received a denial letter was incorrect. If Defendants believed that Plaintiffs had actually received the letter in 2017, Defendants could have raised that belief in some portion of the administrative record. Because they did not do so, Defendants' present attempt to contradict the record through a bald and unsupported allegation is belated, improper, and beyond the permissible scope of the Court's review. The Court should find, and Plaintiffs' uncontradicted representation on the record clearly reflects, that this letter was not communicated to Plaintiffs until June 8, 2018.[7]

This conclusion is further supported by the reality that, upon receiving Plaintiffs' notice that they had never received a denial letter, Defendants afforded Plaintiffs an internal appeal in May of 2018. Under ERISA, Plaintiffs' appeal would have been late had they actually received

---

[5] *See* Rec. 0140-42.
[6] *See* Rec. 3117.
[7] *See* Rec. 2253-61, 3117.

the denial letter in March of 2017. By affording Plaintiffs an internal appeal anyway, Defendants

tacitly conceded that Plaintiffs had not initially received Defendants' denial letter.

17. MHN also informed Uinta of the denial and its reasoning, and Uinta agreed to inform

I.W.'s parents. A.R. 143-44.

**Plaintiffs' Response:** Plaintiffs do not dispute this assertion but do note that it is

irrelevant. Under ERISA, Defendants were required to notify Plaintiffs of denials in writing "not

later than 90 days after receipt of the claim by [Defendants]."[8] They did not actually do so until

June of 2018.[9]

20. In the May 10, 2018 letter, I.W.'s parents claimed that they never received the March

1, 2017 denial letter. A.R. 633. Health Net attaches hereto an affidavit attesting that it sent the

March 1, 2017 letter to I.W.'s parents at their address of record. *See* Ex. 2 ¶ 2 (Aff. of Kathy

Hughan).

**Plaintiffs' Response:** Again, Plaintiffs dispute that this letter was received by the

Plaintiffs and note that there is no evidence in the record contradicting Plaintiffs' assertion that

they did not receive Defendants' denial letter prior to May of 2018.

And again, Plaintiffs note that the scope of the Court's review is limited to the

administrative record. Because of this, Defendants' attempt to manufacture a better position for

themselves by relying on extra-record affidavits is wholly improper. The Court should disregard

all of Defendants' extra-record evidence and afford no weight to any of Defendants' assertions of

fact that rely on that evidence. The Defendants were told by the Plaintiffs in the prelitigation

appeal process that the Plaintiffs did not receive the March 1, 2017, letter. If Defendants wanted

the record to reflect that that they believed they "sent the March 1, 2017 letter to I.W.'s parents

---

[8] 29 CFR § 2560.503-1(f)(1).
[9] *See* Rec. 2253-61, 3117.

at their address of record," Defendants had ample opportunity to include that assertion in the prelitigation appeal record that they themselves had a fiduciary duty to create and maintain. They did not do so and cannot rewrite the facts of this case now.

29. In explaining the decision on appeal, Health Net described its reviewer as "board certified in Obstetrics and Gynecology." A.R. 621. This reference to "obstetrics and gynecology" was a typo. Ex. 1 ¶ 9. As attested in the attached affidavit, Dr. Jaeger, who reviewed the claim on appeal, is board-certified in psychiatry and has over forty-two years of experience in behavioral health, including as an assistant professor of clinical psychiatry at Columbia University and chief of an intensive care inpatient treatment unit at a psychiatric hospital in New York. Ex. 1 ¶¶ 1-2. He still maintains an active intensive outpatient psychiatric practice and treats approximately 30 patients per month. Ex. 1 ¶ 3.

**Plaintiff's Response:** Once again, Plaintiffs note that the permissible scope of the Court's review is limited to the administrative record. As such, Defendants' attempts to introduce extra-record evidence so that they can circumvent inconvenient portions of the record are wholly improper. The Court should not consider Defendants' extra-record evidence and should afford no weight to assertions of fact grounded in that extra-record evidence.

With that in mind, Plaintiffs dispute this assertion. Defendants' representation on the record is that the anonymous reviewer who reviewed the denial on appeal was "board certified in Obstetrics and Gynecology."[10] Defendant has not pointed to any evidence in the record that contradicts this representation.[11] Accordingly, Plaintiffs assert that the anonymous reviewer who conducted Defendants' review on appeal was "board certified in Obstetrics and Gynecology" and

---

[10] Rec. 6981-82.
[11] *See generally* Defendants' Motion for Summary Judgment.

dispute Defendants' extra-record attempt to attribute the review to some other individual with qualifications more favorable for Defendants.

31. In this narrative, I.W. admitted that she "had made a good amount of progress by February 2017." . . .

**Plaintiffs' Response:** While Plaintiffs do not dispute that this phrase does appear in I.W.'s narrative, they note that Defendants have stripped it of all meaningful context. If the Court were to read I.W.'s full statement, it would note that she also represents that in February 2017 I.W. "still struggled in many regards[,]" that she used Benadryl and cough syrup "over the next several weeks [in February]" to get high, that she "engaged in a destructive and inappropriate relationship" with a peer even though she was "afraid of the peer," that she "lied about the relationship" to her therapist, that she "had not learned how to create and maintain healthy relationships or boundaries with others," that she "still wasn't strong enough to not engage in self-destructive behavior[,]" that she "struggled to follow the rules of Uinta and the guidelines set by [her] therapist[,]" that she "was participating in sexually inappropriate behavior for several months past [Defendants'] denial date[,]" that she "needed the assistance of [her] therapist and the staff in order to maintain emotional regulation and safe behaviors[,]" that she felt she "would have chosen to engage in self-harm" had she not been in residential treatment, and that she was experiencing "increased anxiety [that] would not have been manageable" outside of residential treatment.[12]

35. Based on these documents, the MAXIMUS reviewer found I.W.'s extended stay at Uinta was not medically necessary because I.W. did not display any of the InterQual criteria symptoms or behaviors during the relevant evaluation period. A.R. 605-06.

---

[12] Rec. 6827-28.

**Plaintiffs' Response:** Plaintiffs dispute Defendants' characterization that the MAXIMUS reviewer determined that "I.W. did not display any of the InterQual criteria symptoms or behaviors during the relevant evaluation period." In reality, the MAXIMUS reviewer used the same incorrect and distorted articulation of the InterQual Criteria that Defendants included in their statement of facts. All the MAXIMUS reviewer determined was that: "Per InterQual criteria 2016.3 Child and Adolescent Psychiatry Criteria Residential Treatment Center, extended stay there must be documentation within the last week of either physical altercations, sexually inappropriate behavior, evidence of worsening depression, runaway behavior, self-mutilation, suicidal or homicidal ideation."[13] The MAXIMUS reviewer then found that "[b]ased on the information provided in the chart, [I.W.] did not display any of *these* such behaviors within the specified time."[14] Plaintiffs note that the MAXIMUS reviewer did not make any finding as to whether I.W. displayed any of other InterQual Criteria symptoms or behaviors, which are significantly more extensive than the short list of symptoms that Defendants[15] and the MAXIMUS reviewer[16] apparently relied on.

Plaintiffs further note that the MAXIMUS reviewer explicitly did not refer to the actual InterQual Criteria in explaining his or her decision, as the reviewer's statement that "there must be documentation within the last week of either physical altercations, sexually inappropriate behavior, evidence of worsening depression, runaway behavior, self-mutilation, suicidal or homicidal ideation" is not an accurate statement of the relevant criteria and gives no indication that the reviewer was aware of, or if aware gave any heed to, the full criteria. Given this, it is reasonable to conclude from the record that the MAXIMUS reviewer thought that the only

---

[13] Rec. 0606.
[14] *Id*. (emphasis added).
[15] *See* Plaintiffs' Response to Defendants' Statement of Facts No. 14, *supra*
[16] *See* Rec. 0606.

symptoms or behaviors that would justify extended residential treatment under the InterQual

Criteria were: 1) a physical altercation; 2) sexually inappropriate behavior; 3) worsening

depression; 4) runaway behavior; 5) self-mutilation; 6) suicidal behavior; or 7) homicidal

behavior.[17] The Court should afford no weight to Defendants' assertion that the MAXIMUS

reviewer made any findings concerning any of the other symptoms or behaviors mentioned by

the InterQual Criteria.

## **PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS**

Per DUCivR 56(c)(5), Plaintiffs allege that the facts contained on pages 2 through 19 of

Plaintiffs' own Motion for Summary Judgment are undisputed and relevant to showing that they

are entitled to judgment in their favor and by extension that Defendants' motion should be

denied. Plaintiffs incorporate those facts into this opposition by reference.

## **STANDARD OF REVIEW**

Absent special circumstances that are not present in this case, a court's review in

considering cross motions for summary judgment under ERISA is limited to the administrative

record.[18] This is true regardless of whether the Court determines to apply the arbitrary and

capricious or the *de novo* standard of review.[19]

---

[17] Indeed, it is also not unreasonable to assume that *Defendants* were under the impression that these were the only seven symptoms or behaviors that would justify extended residential treatment. *See Rec.* 0105-06 (incorrectly indicating that the "InterQual medical necessity standards . . . state that there must be reports within the last week of physical altercations, sexually inappropriate behavior, evidence of worsening depression, runaway behavior, self-mutilation, or suicidal or homicidal ideation" and denying I.W.'s claims because she was "not having any of *those* symptoms or behaviors" (emphasis added)); *see also* Rec. 6981-82 (incorrectly stating that "InterQual criteria standards state that there must be reports within the last week of either physical altercations, sexually inappropriate behavior, evidence of worsening depression, runaway behavior, self-mutilation, suicidal or homicidal ideation" and denying I.W.'s claims because she was "not having any of *these* symptoms or behaviors" (emphasis added)).
[18] *LaAsmar v. Phelps Dodge Corp. Life*, 605 F.3d 789, 796 (10th Cir. 2010) (noting in the ERISA context that "summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record . . ."); *see also Carlile v. Reliance Std. Life Ins. Co.*, 2021 U.S. App. LEXIS 5013, *7 (10th Cir. 2021) (reinforcing this same proposition).
[19] Concerning the arbitrary and capricious standard of review, *see Hall v. UNUM Life Ins. Co.*, 300 F.3d 1197, 1201 (10th Cir. 2002) (noting that "[t]his Circuit, along with the majority of other federal courts of appeals, has held that in reviewing a plan administrator's decision for abuse of discretion, the federal courts are limited to the

Perplexingly, Defendants identify the proper scope of the Court's review in their motion, wherein they note that the Court must make its decision "'solely on the administrative record.'"[20] Given this, it is not clear why Defendants believed they were legally permitted to introduce and then rely on extra-record evidence (including multiple affidavits) to support their motion for summary judgment. In reality, Defendants' attempts to rewrite the administrative record in their favor are impermissible. Defendants have cited to no authority, and Plaintiffs are aware of none, permitting them to supplement the record with any of the additional evidence attached to their motion. Indeed, expanding the administrative record to include any of Defendants' extra-record evidence would run squarely afoul of several decades of precedent set by the Tenth Circuit Court of Appeals and sister courts in the District of Utah.[21] Accordingly, the Court should disregard all of Defendants' affidavits and exhibits attached to their motion, and should afford no weight to any of Defendants' arguments or assertions of fact that are not supported by the administrative record.

---

'administrative record[.]'"); concerning *de novo*, *see Jewell v. Life Ins. Co. of N. Am.*, 508 F.3d 1303, 1309 (10th Cir. 2007) (noting that a party may not introduce evidence from outside the administrative record on *de novo* review unless they establish that: (1) the evidence is necessary to the district court's review; (2) the evidence *could not have been* included in the original administrative record; (3) the evidence is not cumulative or repetitive; and (4) the evidence may not be "simply better evidence than the claimant mustered for the claim review[.]" (internal quotation marks omitted)).

[20] *See* Defendants' MSJ at 11-12 (quoting *Michael D. v. Anthem Health Plans of Ky., Inc.*, 369 F. Supp. 3d 1159, 1167 (D. Utah 2019)).

[21] *See, e.g., Blair v. Alcatel-Lucent Long Term Disability Plan*, 688 Fed. Appx. 568, 574 (10th Cir. 2017) ("[W]hen reviewing a plan administrator's decision for abuse of discretion, . . . federal courts are limited to the 'administrative record'" (citation and internal quotation marks omitted, alteration in original); *Murphy v. Deloitte & Touche Group Ins. Plan*, 619 F.3d 1151, 1157 (10th Cir. 2010) ("[W]e have frequently, consistently, and unequivocally reiterated that in reviewing a plan administrator's decision under the arbitrary and capricious standard, the federal courts are limited to the administrative record." (citation and internal quotation marks omitted)), *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1190 (10th Cir. 2007) ("In reviewing a plan administrator's decision, we may only consider the evidence and arguments that appear in the administrative record."), *Sandoval v. Aetna Life and Casualty Ins. Co.*, 967 F.2d 377, 380 (10th Cir. 1992) (noting in the context of arbitrary and capricious review under ERISA that "in effect, a curtain falls when the fiduciary completes its review, and for purposes of determining if substantial evidence supported the decision, the district court *must* evaluate the record *as it was at the time of the decision*" (emphases added)); *see also C.L. ex rel H.L. v. Newmont United States Ltd.*, 2020 U.S. Dist. LEXIS 109827, *6 (D. Utah 2020) (noting in an ERISA context that "the court considers only the arguments and evidence before the administrator at the time it made the decision." (brackets, citation, and internal quotation marks omitted)).

## ARGUMENT

### I.   DEFENDANTS ARE NOT ENTITLED TO A DEFERENTIAL STANDARD OF REVIEW.

Defendants argue that they are entitled to a deferential "arbitrary and capricious" standard of review for their denials of I.W.'s claims because: (1) the Plan provides Defendants with discretionary authority; and (2) Defendants maintain they "substantially complied with ERISA's procedural requirements."[22] Defendants base the latter proposition, in part, on their unsupported allegation that they communicated their initial denial letter to Plaintiffs on March 1, 2017.[23]

While Plaintiffs concede that with more scrupulous behavior from the Defendants in following the requirements of ERISA's claims procedures, the language of the Plan would be sufficient to allow Defendants the benefit of the abuse of discretion review standard, that is not the case here. Instead, as Plaintiffs note on pages 19-26 of their own Motion for Summary Judgment, which Plaintiffs incorporate here by reference, *de novo* review is appropriate in this case because Defendants consistently and comprehensively failed to comply with the minimum procedural requirements established under ERISA.

Specifically, Defendants have forfeited their opportunity for *de novo* review because, in demonstrable violation of both their statutory obligations and responsibilities imposed by federal regulations, Defendants: 1) did not consult with medical professionals who had appropriate training and experience with adolescent mental health care, but instead denied I.W.'s claims based on a review conducted by an unnamed Arizona physician "board certified in Obstetrics and Gynecology;"[24] 2) failed to reveal the identity and relevant credentials of the all reviewers

---

[22] *See* ECF Doc. No. 44 at 11-17.
[23] *See id*. at 15 (relying on an extra-record exhibit Defendants impermissibly attached to their motion).
[24] *See* Rec. 6981-82. Again, Plaintiffs note that the scope of the Court's review is confined to the administrative record and Defendants may not introduce extra-record evidence to convert this bad fact into one that is better for them at this late juncture in Plaintiffs' challenges to Defendants' denials.

14

who made the medical necessity determinations concerning I.W.'s care because, again, the Obstetrician/Gynecologist was anonymous;[25] 3) did not apply the Plan's terms to I.W.'s specific medical circumstances; 4) did not take any of the information Plaintiffs submitted during their appeals into account; 5) made no attempt to engage in a "meaningful dialogue" with Plaintiffs concerning Defendants' denials; and 6) made no attempt to describe any additional material or information that would be necessary to perfect I.W.'s claims.

In addition, and as a seventh independent ground for *de novo* review, Plaintiffs note that under ERISA, Defendants were required to notify Plaintiffs of denials in writing "not later than 90 days after receipt of the claim by [Defendants]."[26] As Plaintiffs' uncontroverted representation on the record demonstrates, Defendants actually did not communicate their written denials to Plaintiffs until June of 2018, more than a year after their denial decision.[27]

Per the Department of Labor's regulations establishing the minimum procedural standards a defendant must adhere to under ERISA, each of these individual failures should result in the Court's determination that Defendants denied Plaintiffs' claims "on review *without the exercise of discretion by an appropriate fiduciary*."[28] Because of these persistent failures, the Court should apply the *de novo* standard of review.

## II.    UNDER ANY STANDARD OF REVIEW, DEFENDANTS VIOLATED ERISA BY DENYING I.W.'s CLAIMS.

Plaintiffs contend that the Court should apply the *de novo* standard of review in this case. However, even if the Court applies the more deferential arbitrary and capricious standard, the

---

[25] *See id*.
[26] 29 CFR § 2560.503-1(f)(1).
[27] *See* Rec. 2253-61, 3117. Again, Plaintiffs note that Defendants had every opportunity to contradict Plaintiffs' assertions on the record and elected not to do so – Defendants may not rely on extra-record evidence to "backfill" diligence where they were initially desultory.
[28] 29 C.F.R. § 2590.715-2719(b)(2)(ii)(F)(1)-(2) (emphasis added).

evidence in the record amply demonstrates that Defendants acted arbitrarily and capriciously in denying I.W.'s claims for further residential treatment at Uinta.

As the Tenth Circuit has emphasized, the abuse of discretion standard of review is "not without meaning."[29] Where a claim administrator's decision is not supported by substantial evidence "based upon the record as a whole," with the court taking into account "whatever in the record fairly detracts from its weight," the court should determine that the administrator's decision was arbitrary and capricious.[30] Additionally, the Court's abuse of discretion review should account for the fact that the claim administrator, acting as a fiduciary "must discharge its duties with respect to discretionary claims decisions solely in the interests of the participants and beneficiaries of the plan . . . and consistent with this standard of care must provide a full and fair review of claim denials."[31] Here, the record does not support Defendants' contention that they met those obligations, and accordingly does not contain "substantial evidence" that Defendants' decisions were not arbitrary and capricious.

First, Defendants' denials were arbitrary and capricious because I.W.'s continued treatment was medically necessary under both the terms of the Plan and the InterQual Criteria, and Defendants only avoided that conclusion by failing to apply the actual InterQual Criteria to I.W.'s claims at any point during their reviews – instead relying on a cherrypicked list of seven symptoms they believed I.W. had not displayed. Second, Defendants' denials were arbitrary and capricious because Defendants disregarded and did not engage with the opinions of I.W.'s treating professionals. And third, Defendants' denials were arbitrary and capricious because they

---

[29] *McMillan v. AT&T Umbrella Benefit Plan No. 1*, 746 F. App'x 697, 705 (10th Cir. 2018).
[30] *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1134 (10th Cir. 2011) (citation and internal quotation marks omitted).
[31] *Raymond M. v. Beacon Health Options, Inc*., 463 F. Supp. 3d 1250, 1266 (D.Utah 2020) (brackets, citations, and internal quotation marks omitted) (holding that a similarly situated claim administrator acted arbitrarily and capriciously in denying benefits for mental health and substance use disorders).

did not apply any specific terms of the Plan to any specific portion of I.W.'s medical records, but instead grounded their determination solely on their badly truncated and distorted articulation of the InterQual Criteria.

For each of these independent reasons, the Court should deny Defendants' motion.

### A. I.W.'s Care Was Medically Necessary Under Both the Terms of the Plan and the InterQual Criteria.

Defendants begin their argument by asserting that the InterQual Criteria "reflect generally accepted standards of care" and that they are widely recognized as appropriate guideposts to evaluate the medical necessity of mental health treatments.[32] Plaintiffs note that they do not necessarily agree that the InterQual Criteria reflect generally accepted standards of care for mental health treatment. However, in this particular case, Plaintiffs do not ask the Court to reach that issue, because Defendants' misuse and distortion of the InterQual Criteria was so egregious that the Court may find Defendants acted arbitrarily and capriciously *even if* the Court assumes the InterQual Criteria were wholly appropriate to evaluate I.W.'s claims.

In fact, while Defendants claim that their reviewers denied I.W.'s care based on the terms of the Plan and the InterQual Criteria,[33] and claim that the external reviewer did the same,[34] the record demonstrates that claim is not true. Instead, all of Defendants' internal reviewers, as well as the external reviewer, apparently labored under the misimpression that the InterQual Criteria provided that I.W. could only be approved for further treatment at discovery if she demonstrated: 1) a physical altercation; 2) sexually inappropriate behavior; 3) worsening depression; 4) runaway behavior; 5) self-mutilation; 6) suicidal behavior; or 7) homicidal behavior.[35] This

---

[32] *See* ECF Doc. No. 44 at 18-19/
[33] *See* ECF Doc. No. 44 at 18-22.
[34] *Id*.
[35] *See Rec.* 0105-06 (in which Defendants' first reviewer incorrectly states that the "InterQual medical necessity standards . . . state that there must be reports within the last week of physical altercations, sexually inappropriate behavior, evidence of worsening depression, runaway behavior, self-mutilation, or suicidal or homicidal ideation"

framing does not reflect the actual InterQual Criteria for continued care at a residential treatment center such as Uinta, but rather significantly truncates and distorts them. Whether the distortion was deliberate, as may have been the case as Defendants appear to have cherrypicked symptoms they did not believe I.W. was manifesting (i.e. "runaway behavior," and "homicidal ideation") while ignoring symptoms listed in the InterQual Criteria that *did* apply to I.W., or inadvertent is not critical to identify. Regardless of whether there was conscious bad faith involved, the Defendants' failure to properly apply the InterQual Criteria was an abuse of discretion.[36]

Notably, the InterQual Criteria identify a number of circumstances and elements I.W. was experiencing after the Defendants denial of coverage and during the time she was being treated at Uinta.  For example, the InterQual Criteria provide that, in the case of a patient with an "Eating Disorder," continued care at a residential treatment facility is medically necessary if any of the following were found to apply to the patient:[37]

> …
> - Unable to make appropriate food choices without assistance or supervision at all meals
> …

---

and denies I.W.'s claims because she was "not having any of *those* symptoms or behaviors" (emphasis added)), Rec. 6981-82 (in which Defendants' second reviewer incorrectly states that "InterQual criteria standards state that there must be reports within the last week of either physical altercations, sexually inappropriate behavior, evidence of worsening depression, runaway behavior, self-mutilation, suicidal or homicidal ideation" and denies I.W.'s claims because she was "not having any of *these* symptoms or behaviors" (emphasis added)); *see also* Rec. 0606 (in which the external reviewer incorrectly states that the InterQual criteria require evidence "within the last week of either physical altercations, sexually inappropriate behavior, evidence of worsening depression, runaway behavior, self-mutilation, suicidal or homicidal ideation" and upholding the denials because I.W. "did not display any of *these* such behaviors within the specified time" (emphasis added)).

[36] *See, e.g., Scott M. v. Blue Cross & Blue Shield of Mass.*, 2021 U.S. Dist. LEXIS 57101 *28-33 (noting in the context of a claims administrator's denial of mental health and substance abuse claims under an ERISA plan that failure to correctly apply and assess InterQual Criteria is an abuse of discretion), *James F. ex rel C.F. v. Cigna Behavioral Health, Inc.*, 2010 U.S. Dist. LEXIS 136134, *17-18 (noting that "[t]he failure to act in accordance with the documents governing the ERISA plan is [ ] a breach of fiduciary duty" and therefore "arbitrary and capricious"); *see also McGraw v. Prudential Ins. Co. of Am.*, 137 F.3d 1253, 1259 (10th Cir. 1998) ("A decision to deny benefits is arbitrary and capricious if it is not a reasonable interpretation of the plan's terms."); *see also* 29 U.S.C. § 1104(a)(1)(D) (providing that a fiduciary under ERISA "shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and[ ] *in accordance with the documents and instruments governing the plan* . . ." (emphasis added)).

[37] *See* Rec. 0032-37.

    o Attempting to restrict at meals
     even when supervised by staff
   …
    o Food refusal or persistent decline
     in oral intake
   … [or]
    o Restricting at meals when not
     supervised[.]
  …[38]

With respect to patients experiencing a "[s]erious emotional disturbance," the InterQual criteria

provide that continued care at a residential treatment facility is medically necessary if any of the

following apply to the patient:[39]

     …
     • Easily frustrated and impulsive
     …
     • Persistent rule violations
     … [or]
     • Sexually inappropriate
    …[40]

The InterQual Criteria further provide that continued care at a residentially treatment facility is

medically necessary if a patient is "[u]nable to establish positive peer or adult relationships[.]"[41]

   Moreover, the Plan defines medically necessary services as those that are:

> health care services that a Physician,
> exercising prudent clinical judgment, would
> provide to a patient for the purpose of
> preventing, evaluating, diagnosing or treating
> an Illness, Injury, disease or its symptoms,
> and that are:
>
> 1.  In accordance with generally accepted
>     standards of medical practice;
> 2.  Clinically appropriate, in terms of type,
>     frequency, extent, site and duration, and

---

[38] *See* Rec. 0037.
[39] *See* Rec. 0032-37.
[40] *See* Rec. 0037-38.
[41] *See* Rec. 0038.

considered effective for the patient's
Illness, Injury or disease; and

3. Not primarily for the convenience of the
patient, Physician, or other health care
Provider, and not more costly than an
alternative service or sequence of services
at least as likely to produce equivalent
therapeutic or diagnostic results as to the
diagnosis or treatment of that patient's
Illness, Injury or disease.

For these purposes, "generally accepted
standards of medical practice" means
standards that are based on credible scientific
evidence published in peer-reviewed medical
literature generally recognized by the relevant
medical community, Physician Specialty
Society recommendations, the views of
Physicians practicing in relevant clinical areas
and any other relevant factors.

The fact that a Provider may prescribe, order,
recommend or approve a treatment, service,
supply or medicine does not in itself make the
treatment, service, supply or medicine
Medically Necessary.[42]

In its recent decision in *Wit v. United Behavioral Health*, the Northern District of

California further elaborated on generally accepted standards of mental health care and held that

"[i]t is a generally accepted standard of care that the determination of the appropriate level of

care for patients with mental health and/or substance use disorders should be made on the basis

of a multidimensional assessment that takes into account a wide variety of information about the

patient."[43]   The court in *Wit* also explained the differences between levels of mental health

treatment, particularly, the differences between residential and acute inpatient treatment:

[I]n the area of mental health and substance use disorder treatment,
there is a continuum of intensity at which services are delivered. In
the most extreme situations, where a patient poses an imminent

---

[42] Rec. 0345.
[43] 2019 U.S. Dist. LEXIS 35205, at *84.

> risk of serious harm to self or others, a provider will recommend inpatient hospitalization...The focus of treatment at this level of service is crisis stabilization, that is, to address the acute crisis so that the patient can be moved to a lower level of care where the patient 'can get back to doing the work that needs to happen over time" to address the 'drivers of the recurrent risk of crisis.'
>
> The next level of intensity below inpatient hospitalization is residential treatment. Residential treatment is for individuals who do not pose an imminent risk of serious harm to self or others (i.e., who do not need inpatient hospitalization), but rather, 'because of specific functional limitations, need safe and stable living environments and 24-hour care'… At this level of care, treatment is not limited to addressing acute symptoms to achieve crisis stabilization; instead, it is designed to provide patients with an 'opportunity to engage underlying chronic, recurrent, comorbid issues' so that they are able to 'turn a corner' and move to a lower level of service intensity.[44]

In this case, I.W.'s struggles with self-harm, depression, anxiety, anorexia, and suicidal ideation began in 2013, three years before she began to receive treatment at Uinta.[45] During 2016 alone, I.W. was discovered to have attempted suicide five times.[46] Eight days before Defendants determined I.W. did not need further treatment at Uinta, I.W. was discovered to have been abusing cough syrup to get high – an event that caused her clinician to note that she was "in relapse" and would not be safe if she returned home.[47] In the months that followed Defendants decision to deny I.W.'s claims, I.W. continued to attempt to restrict her food intake (eventually necessitating that she be monitored at arms-length by her treatment team during her meals – a level of oversight that I.W.'s providers maintained for months after Defendants denied continuing coverage),[48] engaged in a sexually inappropriate relationship with a peer that she

---

[44] *Id.* at *62-64 (N.D. Cal. 2019) (emphasis added) (internal citations omitted).
[45] *See* Rec. 7022-37, 7048.
[46] *See* Rec. 7048.
[47] *See* Rec. 3393, 3397.
[48] *See* Rec. 2989, 3129, 3163, 3173, 3183-84, 3192, 3197, 3290, 3330, 3342, 9470.

refused to break off,[49] relapsed to prior bad behaviors during a home visit,[50] continued to struggle to manage her symptoms of anxiety and depression,[51] and continued to struggle with relapse behaviors as late as October of 2017.[52]

On their face, under both the terms of the Plan and the InterQual Criteria, these symptoms demonstrate that it was medically necessary for I.W. to continue to receive mental health care after February 22, 2017. "It is a generally accepted standard of care that effective treatment requires treatment of co-occurring behavioral health disorders and/or medical conditions in a coordinated manner that considers the interactions of the disorders and conditions and their implications for determining the appropriate level of care."[53] Moreover, effective mental health treatment does not only focus on alleviating current symptoms, but also treating "chronic underlying conditions."[54]

In this light, it is particularly relevant that the InterQual Criteria instruct that continued care at a residential treatment center is medically necessary if a patient: (1) restricts at meals if they are not supervised; (2) attempts to restrict at meals even when supervised by staff; (3) refuses food; (4) engages in persistent rules violation; (5) is easily frustrated or impulsive; (6) engages in sexually inappropriate behavior; or (7) is not able to establish positive peer or adult relationships. I.W.'s medical records, which were submitted to Defendants along with Plaintiffs' appeal,[55] amply demonstrate that I.W. displayed all of these behaviors for months following February 22, 2017. Accordingly, Defendants acted arbitrarily and capriciously by denying I.W.'s claims as of that date.

---

[49] *See* Rec.  3140, 3263, 3335, 3340, 3350.
[50] *See* Rec. 3267, 3272, 3286.
[51] *See generally* Rec. 7814-9414; *see also* Rec. 3157-58.
[52] *See* Rec. 9476-80.
[53] *Wit*, 2019 U.S. Dist. LEXIS 35205, at *71
[54] *Id.* at *69
[55] *See* Rec. 7814-9414.

Defendants attempt to avoid this conclusion by claiming that "[b]y I.W.'s own admission, she had made a 'good amount of progress by February 2017.'"[56] This misrepresents I.W.'s actual letter to Defendants, which was written as part of her external review.

In her letter, I.W. also states that in February 2017 she "still struggled in many regards[,]" that she used Benadryl and cough syrup "over the next several weeks" to get high, that she "engaged in a destructive and inappropriate relationship" with a peer even though she was "afraid of the peer," that she "lied about the relationship" to her therapist, that she "had not learned how to create and maintain healthy relationships or boundaries with others," that she "still wasn't strong enough to not engage in self-destructive behavior[,]" that she "struggled to follow the rules of Uinta and the guidelines set by [her] therapist[,]" that she "was participating in sexually inappropriate behavior for several months past [Defendants'] denial date[,]" that she "needed the assistance of [her] therapist and the staff in order to maintain emotional regulation and safe behaviors[,]" that she felt she "would have chosen to engage in self-harm" had she not been in residential treatment, and that she was experiencing "increased anxiety [that] would not have been manageable" outside of residential treatment.[57] As these statements make evident, when the quote Defendants cherry-picked is put back into context I.W.'s statement bolsters, rather than undermines, the conclusion that her care continued to be necessary under the InterQual Criteria. The problems I.W. identified persisted during her time at Uinta long after Defendants improperly refused to continue to pay her claims.

Defendants also try to argue that I.W. "no longer met the InterQual criteria for residential treatment" because "I.W.'s family was actively involved in her treatment[.]" Defendants do not cite to, and Plaintiffs are not aware of, any portions of the InterQual Criteria that indicate that a

---

[56] *See* ECF Doc. No. 44 at 20.
[57] Rec. 6827-28.

patient who displays *many* of the symptoms that individually justify continued care suddenly no longer needs continued care purely because they have a supportive family. Accordingly, to the extent Defendants' reviewers based their denials on the logic that I.W. did not need continued residential treatment because her family was supportive, those decisions were also arbitrary and capricious.

Further, Plaintiffs note that the record does not reveal any basis for Defendants' determination that February 22, 2017, of all days, was the last appropriate day to cover I.W.'s treatment at Uinta. Eight days prior, I.W. had been caught drinking cough syrup to get high.[58] Five days after February 22nd, I.W.'s treatment team discovered that I.W. had engaged in, and then concealed, an inappropriate sexual relationship with a peer.[59] Three days later, on March 1, I.W.'s clinician expressed concern that I.W. was finding ways to restrict her food intake and instructed her treatment team to increase their oversight during I.W.'s meals.[60] That same day, the clinician noted that I.W. was displaying symptoms of anxiety and depression.[61] In the months that followed, I.W. would continue to display symptoms that clearly justified continued care under the InterQual Criteria.[62]

Given this context, Defendants' selection of February 22, 2017 as the last date for which benefits would be paid on I.W.'s claim appears to be entirely arbitrary. As this Court has previously warned, it is "inappropriate" for a claim administrator to arbitrarily and prematurely choose to deny coverage after a particular date in the absence of some justification from the

---

[58] *See* Rec. 3397.
[59] *See* Rec. 3350.
[60] *See* Rec. 3342.
[61] *See id*.
[62] *See* Plaintiffs' Motion for Summary Judgment, Facts Nos. 43-71.

record.[63] The Court should find that Defendants' decision to deny coverage after February 22, 2017 was arbitrary and capricious.

In addition, "[w]hile effective treatment may result in improvement in the patient's level of functioning, it is well-established that effective treatment also includes treatment aimed at preventing relapse or deterioration of the patient's condition and maintaining the patient's level of functioning."[64] Further, removing a patient from residential treatment is not warranted merely because they are "not displaying the overt problems for which [they were] admitted," but rather requires a factually-supported determination that the patient will not return to their "prior dynamic of decline" if removed from treatment.[65] Many treating clinicians determined that I.W.'s chronic underlying conditions and propensity towards relapse could not be treated without further care at a residential treatment center.[66] Defendants' denial rationale deviated wildly, and inexplicably, from both the Plan's explanation of medical necessity and from the conclusions drawn by I.W.'s clinicians who offered their professional medical opinions concerning her needs.[67]

The information demonstrating that I.W.'s mental health care was medically necessary was available to Defendants. Indeed, Plaintiffs asked Defendants to review this information and specifically provided authorization to facilitate Defendants' review of I.W.'s medical records.[68] Nothing prevented Defendants from doing a thorough and competent evaluation of the medical

---

[63] *Charles W. v. Regence BlueCross BlueShield of Or.*, 2019 U.S. Dist. LEXIS 167184, *26-32 (D.Utah 2019).
[64] *Id.* at *79; *see also S.B. v. Oxford*, 419 F. Supp. 3d at 360 (holding that a claim administrator had erred when it "focused on the stabilization of [a plaintiff's] acute symptoms" and the plaintiff's "immediate safety" over a treating team's concerns about the "likely ineffectiveness of treating [the Plaintiff's] underlying [ ] disorder at lower levels of care.")
[65] *Wiwel v. IBM Med. & Dental Ben. Plans for Regular Full-Time & Part-Time Employees*, 2017 U.S. Dist. LEXIS 46377, *12-14 (E.D.N.C. 2017) (citation and internal quotation marks omitted)).
[66] *See* Rec. 3158, 3393, 9480.
[67] *See* Rec. 0105-11, 6981-82.
[68] Rec. 0539-96, 0646-52, 2721-59.

necessity of I.W.'s treatment, but there is little in the Record to reflect that Defendants ever carried out that review despite Plaintiffs' requests that they do so and despite the Tenth Circuit's mandate that Defendants could not "shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement [to benefits]."[69] By failing to address I.W.'s medical records, Defendants acted arbitrarily and capriciously and fell short of their fiduciary obligation.

Because I.W.'s treatment was medically necessary under the terms of the Plan and the InterQual Criteria, because Defendants misrepresented the InterQual Criteria to come to the opposite conclusion, because Defendants' selection of February 22, 2017, as the last date of coverage was arbitrary, and because Defendants did not meaningfully engage with I.W.'s medical history demonstrating that her treatment was medically necessary, the Court should deny Defendants' motion.

**B. Defendants' Failures to Engage with the Opinions of I.W.'s Treating Professionals and Decision to Disregard Those Opinions Were Also Arbitrary and Capricious.**

In their appeals, Plaintiffs included one letter from a professional who had treated I.W. and several medical records reflecting the opinions of I.W.'s clinician and treatment team, all of which indicated that I.W.'s treating professionals believed it was medically necessary for I.W. to receive more residential treatment.[70] Defendants did not acknowledge these letters and did not address them in any of Defendants' denials.[71] As noted previously, Defendants were not entitled to cherry-pick only the evidence that supported their conclusion from the Record, nor were they entitled to "shut their eyes to readily available information when the evidence in the record

---

[69] *Gaither*, 394 F.3d at 807.
[70] *See* Rec. 3158, 3393, 7048, 9480.
[71] *See* Rec. 0105-11, 6981-82.

suggests that the information might confirm the beneficiary's theory of entitlement [to benefits]."[72] Indeed, the Supreme Court has noted that similarly situated defendants are not entitled to "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."[73] Treating physicians have a "greater opportunity to know and observe the patient as an individual compared to individuals who have not examined the patient and are simply reviewing medical records."[74]

The Tenth Circuit has applied the principles in *Nord* specifically to cases involving an abuse of discretion standard of review.[75] Even before *Nord* was decided, the Tenth Circuit held that un-refuted evidence or testimony presented by a claimant in the pre-litigation claim and appeal process may not be disregarded by an ERISA plan administrator.[76] "Testimony as to a simple fact capable of contradiction, not incredible, and standing uncontradicted, unimpeached… must be taken as true... "Un-impeached credible evidence may not be disregarded by the trier of fact" as Defendants did here.[77]

It is especially improper to ignore the findings and conclusions of a patient's treating physicians when dealing with the care of individuals who have mental, behavioral, or emotional conditions. When the information from a medical record arises out of an examination of a mental health patient, the treating physician is in a better position to evaluate and come to valid conclusions about the symptoms and diagnoses of a patient than a record reviewer.[78] Defendants

---

[72] *Gaither*, 394 F.3d at 807.
[73] *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).
[74] *Id.* See also, *Westphal v. Eastman Kodak Co.,* 2006 U.S. Dist. LEXIS 41494, *13 (W.D.N.Y. 2006) ("There can be no serious doubt that a psychiatric opinion based on a face-to-face interview with the patient is more reliable than an opinion based on a review of a cold, medical record")
[75] *Rasenack*, 585 F.3d at 1325-1326; *Fought,* 379 F.3d at 1000, n.1.
[76] *Gaylor v. John Hancock Mut. Life Ins. Co*., 112 F.3d 460, 467-468 (10th Cir. 1997).
[77] *Id.*
[78] *Rasenack*, 585 F.3d at 1325; *Westphal,* 2006 U.S. Dist. LEXIS 41494, *13

cannot "cherry-pick[] the information contained in the Record…helpful to [their] decision to deny" coverage for I.W.'s treatment.[79]

Because of this, Defendants' refusal to acknowledge or address the opinions of I.W.'s treating professionals was arbitrary and capricious, and the Court should deny Defendants' motion.

### C. Defendants Also Acted Arbitrarily and Capriciously When They Did Not Apply Any Specific Terms of the Plan to Any Specific Portion of I.W.'s Medical Records.

At no point in any of Defendants' denials did Defendants cite to specific provisions of the Plan, specific portions of I.W.'s medical records, or any reports conducted by Defendants' medical professionals that may have formed the basis for Defendants' denials of coverage.[80] Sister courts in the District of Utah have previously ruled that "an ERISA plan fiduciary's failure to utilize the proper plan language or criteria in evaluating whether a plan beneficiary is entitled to benefits is an abuse of discretion."[81] Other District of Utah Judges have ruled that when a claim administrator's denial letters "contain neither citations to the medical record nor references to the reports by [the defendants'] doctors" concerning a claimant's condition but are instead composed of "conclusory statements without factual support," the denial is arbitrary and capricious.[82] Because Defendants did not explain any of the factual findings to support their denials and did not even articulate Plan provisions under which they denied coverage for I.W.'s treatment, the Court should deny Defendants' motion.

---

[79] *Rasenack,* 585 F.3d at 1326.
[80] *See generally* Rec. 0447-56, 0474-84, 1617-26, 1672-81, 1682-92, 1693-1702, 2305-2315, 2525-2534.
[81] *James F. ex rel. C.F. v. Cigna Behavioral Health, Inc*., 2010 U.S. Dist. LEXIS 136134 *17 (D. Utah 2010) (Kimball, J.)
[82] *Raymond M.*, 463 F. Supp. 3d at 1282; *see also Kerry W. v. Anthem Blue Cross & Blue Shield*, 444 F. Supp. 3d 1305, 1313 (D. Utah 2020) (holding that claim administrator's denial of coverage was "arbitrary and capricious" where the administrator "did not offer any responses to the diagnoses and reports" included in a claimant's appeals and "did not cite any reports by [the claim administrator's] doctors or by doctors at [the treatment facility] on which they relied on reaching their conclusions.")

### III.    THE COURT SHOULD DEFER THE QUESTION OF DAMAGES PENDING RESOLUTION OF THE CROSS-MOTIONS FOR SUMMARY JUDGMENT.

In a footnote to their motion, Defendants advance an argument regarding the proper amount of damages in the event the Court grants Plaintiffs' motion.[83] Plaintiffs contend that it is not appropriate for Defendants to ask the Court to rule on damages in the context of Defendants' motion for summary judgment, and instead ask the Court to defer consideration of any potential briefing on damages until the cross-motions for summary judgment are resolved. In a similar vein, the Plaintiffs request an opportunity to present information to the Court regarding their right to receive, and the amount of, attorney fees and costs under 29 U.S.C. § 1132(g).

### **CONCLUSION**

For all of the foregoing reasons, the Court should deny Defendants' motion.

Dated this 26th day of March, 2021.

/s/ Brian S. King
Attorney for Plaintiffs

---

[83] *See* ECF Doc. No. 44 at 11 n. 2.

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served to

all parties registered to receive Court notices for the above captioned case through the Court's

CM/ECF System.

Dated this 26th day of March, 2021.

/s/ Brian S. King_____