IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| E.W. and I.W.,<br><br>                   Plaintiffs,<br><br>v.<br><br>HEALTH NET LIFE<br>INSURANCE COMPANY and<br>HEALTH NET OF ARIZONA,<br>INC.,<br><br>                   Defendants. | **ORDER AND**<br>**MEMORANDUM DECISION**<br><br>Case No. 2:19-cv-00499-TC-DBP<br><br>District Judge Tena Campbell |

In this Employee Retirement Income Security Act (ERISA) lawsuit, Plaintiffs E.W. and I.W. and Defendants Health Net Life Insurance Company and Health Net of Arizona, Inc. (collectively, "Health Net") have filed cross-motions for summary judgment under Federal Rule of Civil Procedure 56. For the following reasons, the court GRANTS Defendants' motion (ECF No. 44) and DENIES Plaintiffs' motion (ECF No. 48).

## BACKGROUND

Plaintiff E.W. is the father of Plaintiff I.W., a teenager who for years has suffered from serious mental health and behavioral problems. I.W. was admitted to Uinta Academy in September 2016 and received mental health treatment there for over a year. Uinta is a residential treatment facility in Utah that provides subacute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

During this time, I.W. was covered by her father's health insurance through an employee welfare benefit plan governed by ERISA (the Plan). Health Net was the insurer and administrator of the Plan. Health Net approved coverage for I.W.'s treatment through February 22, 2017, but it denied claims for coverage after that date, citing a provision of the Plan that

denies coverage for non-preventative services that are not "medically necessary."  Despite that

denial, I.W. stayed at Uinta until December 2017.

### A.  The Plan's Provisions

The Plan's "Evidence of Coverage" documents explain that Health Net covers non-

preventative services only if they are "medically necessary":

> **[Medically Necessary] Services** are limited to the most effective and efficient level of care and type of service or supply that is <u>consistent with professionally recognized standards of medical practice as determined by Health Net</u>.  If Health Net determines that a service or supply or medication is not Medically Necessary, You will be responsible for payment of that service, supply or medication.

(AR 435 (emphasis added).)  The Plan then says that:

> **Medically Necessary or Medical Necessity** means health care services that a Physician, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an Illness, Injury, disease or its symptoms, and that are:
>
> 1. **In accordance with <u>generally accepted standards of medical practice</u>;**
> 2. **Clinically appropriate**, in terms of type, frequency, extent, site and duration, and considered effective for the patient's Illness, Injury, or disease; **and**
> 3. Not primarily for the convenience of the patient, Physician, or other health care Provider, and **not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results** as to the diagnosis or treatment of that patient's Illness, Injury or disease.

(AR 537 (emphasis added).)  "Generally accepted standards of medical practice" are standards

"based on credible scientific evidence published in peer-reviewed medical literature generally

recognized by the relevant medical community, Physician Specialty Society recommendations,

the views of Physicians practicing in relevant clinical areas and any other relevant factors."  (<u>Id.</u>)

### B.  The Genesis of Health Net's Denial of Coverage

After struggles with anxiety, depression, an eating disorder, and attempted suicide, I.W.

was admitted to Uinta Academy on September 12, 2016.  Health Net had approved I.W.'s

treatment at Uinta through February 22, 2017.[1]  When the pre-authorization period expired,

Health Net's medical director, Dr. Andrei Jaeger, ordered an internal peer-to-peer review to

determine whether I.W.'s circumstances warranted continued coverage of treatment at an around-

the-clock residential treatment center.

Dr. Jaeger selected Prest Associates to conduct the review.  On February 28, 2017,

psychiatrist Dr. Diana Antonacci, affiliated with Prest, reviewed I.W.'s progress with Dr. Brett

Marshall, I.W.'s treating physician at Uinta.  After that review, Dr. Antonacci found that:

1. The patient has no suicidal or homicidal ideation. There are no psychotic symptoms. There is no evidence of grave disability. There has been no recent aggression o[r] severe agitation. There are no severe mood symptoms.
2. There are no comorbid substance use concerns. There are no significant medical problems. The patient is compliant w/ medications. No side effects are documented.
3. The patient's family has been active and involved in her care. She has had off-campus visits. . . . The patient is compliant w/ treatment. She is showing evidence of using coping skills.

(AR 141–42.)  Based on her findings, she told Health Net that:

InterQual Behavioral Health 2016 Child and Adolescent Psychiatry Criteria for a continued stay at a mental health residential treatment level of care are not met as of 2/23/17. There is no evidence that the patient continues to require 24-hour-a-day/7-day-a-week supervision to make progress in her goal areas. There is no evidence that she could not receive support and access to therapeutic services outside of a residential setting. Care should continue in a less restrictive setting. Treatment at intensive outpatient level of care could be considered.

(Id. at 142.)

The InterQual criteria Dr. Antonacci (and the other reviewing physicians) relied upon

specify that justifying a residential treatment beyond fifteen days requires reports within the past

week of symptoms or behaviors that include (i) evidence of physical altercations (for instance,

---

[1] As Defendants note, a different insurer was responsible for I.W.'s time at Uinta from September 12, 2016, to December 31, 2016.  (Defs.' Mot. Summ. J. at 4 n.1, ECF No. 44; AR 143.)

assaultive behavior or destruction of property); (ii) evidence of worsening depression or anxiety; (iii) sexually inappropriate behavior; (iv) runaway behavior; (v) non-suicidal self-injury; or (vi) suicidal or homicidal ideation.[2]  (AR 36–38.)

### C.  Denials

   1.  Initial Denial Letter

After Dr. Antonacci submitted her opinion to Health Net, Dr. Jay Butterman, a practicing psychiatrist and medical director at Health Net, reviewed Dr. Antonacci's findings, Health Net's records, and Uinta's records.  He reached the same conclusion and signed the March 1, 2017 letter denying coverage for "the service requested" (that is, treatment at an adolescent mental health residential treatment center) from February 23, 2017, onward.  He wrote:

> The service requested is being denied . . . because it does not meet InterQual criteria. This determination was based upon our review of your daughter's health condition in relation to InterQual criteria and guidelines and in accordance with the terms and conditions of your Evidence of Coverage, Exclusions & Limitations section.
>
> Specifically, [Health Net] uses McKesson InterQual medical necessity standards to help decide if continued stay at the Adolescent Mental Health Residential Treatment Center (RTC) level of care is needed. These standards state that there must be reports within the last week of physical altercations, sexually inappropriate behavior, self-mutilation, or suicidal or homicidal ideation. Based on the clinical information provided to [Health Net], your daughter is not having any of these symptoms or behaviors. It is reported that she has learned many healthy coping skills and is working on strategies to control her anxiety. She has been opening up significantly in therapy and is no[w] beginning to address core issues related to her poor self-image and thinking errors. Therefore, this request for ongoing treatment at the Adolescent Mental Health RTC level of care does not meet medical necessity criteria.

(AR 105–06.)  Plaintiffs say they did not receive this letter until June 2018.

---

[2] Plaintiffs originally claimed that the InterQual criteria do not reflect generally accepted standards of medical practice, but they abandon that argument in their motion for summary judgment.  Now they claim that the criteria chosen by the reviewing physicians were cherrypicked to guarantee denial and that different criteria support a finding of medical necessity.  As discussed below, the court need not address that complaint.

2.   <u>Internal Appeal</u>

In June 2018, Plaintiffs wrote to Health Net to say they learned of the decision through other channels, and they asked Health Net to reconsider its decision.  In support, they submitted approximately 1,600 pages of I.W.'s medical records.  (AR 633.)

Health Net assigned Dr. Jaeger to review the appeal.  After he reviewed "[Health Net] Records as well as Medical Records Sent [by I.W.'s parents in their appeal]," (AR 628), he agreed with Drs. Antonacci's and Butterman's conclusions and upheld Health Net's decision.  His review notes provide a substantial list of "clinical information" supporting his decision to affirm the denial.  (<u>See</u> AR 628–31.)

Health Net quoted Dr. Jaeger's "Clinical Rationale" in its July 16, 2018 letter affirming the March 2017 denial decision:

> Based on InterQual Behavioral Health Criteria Child and Adolescent Psychiatry guidelines, the medically necessary criteria for continued coverage at [Uinta] Academy, have not been met.  This was based on the Medical Director's conclusion that:
>
> "InterQual criteria standards state that there must be reports within the last week of either physical altercations, sexually inappropriate behavior, evidence of worsening depression, runaway behavior, self-mutilation, suicidal or homicidal ideation. Based on the clinical information provided to [Health Net], your daughter was not having any of these symptoms or behaviors.  Therefore, this request for ongoing treatment at the Adolescent Mental health RTC level of care did not meet medical necessity criteria."

(AR 621–22.)

3.   <u>External Appeal:</u>

After Dr. Jaeger affirmed Health Net's decision, Plaintiffs requested an external independent review from the Arizona Department of Insurance.  The Department hired MAXIMUS Federal Services, an independent review organization, to review the appeal.

Plaintiffs submitted a thirty-one-page letter, along with approximately 1,600 pages of medical records, in support of their appeal.  (AR 6801.)

MAXIMUS appointed a physician, described as a "Medical Expert in Psychiatry" (AR 605), to review Plaintiffs' appeal.  The MAXIMUS reviewer relied on a substantial set of information including the InterQual criteria:

1. Health Net Health Plan Contract;
2. Health Plan preservice denial letter, dated 03/01/2017;
3. Health Plan letter, denial dated 07/16/2018;
4. Appeal letter from Patient, dated 11/14/2018;
5. InterQual Behavior Health Criteria 2016.3 Child and Adolescent Psychiatry;
6. Patient medical records;
7. Internal Plan documents; and
8. References cited by the MAXIMUS physician reviewer[.]

(Id.)

The MAXIMUS reviewer determined that Health Net's denial decision was correct.  On December 19, 2018, MAXIMUS told the Arizona Department of Insurance that "the Health Plan does not have to provide coverage.  Accordingly, the decision of the Health Plan to deny coverage is **upheld**."  (AR 604 (emphasis in original).)

MAXIMUS provided the reviewing physician's reasons to Health Net in its December 19, 2018 letter (AR 566–67), and Health Net passed that information along to Plaintiffs in its December 28, 2018 letter announcing the Arizona Department of Insurance's decision:

Per InterQual criteria 2016.3 Child and Adolescent Psychiatry Criteria Residential Treatment Center, extended stay there must be documentation within the last week of either physical altercations, sexually inappropriate behavior, evidence of worsening depression, runaway behavior, self-mutilation, suicidal or homicidal ideation.  Based on the information provided in the chart, the Insured did not display any of these behaviors within the specified time.  Furthermore, she was not noted to be psychotic, manic, suicidal, homicidal or having symptoms of a major depressive episode.  There is no documentation that the Insured had significant ongoing medical problems that required hospital-based interventions or the Insured had functional impairments.  There is no evidence in the chart of any significant side effects from medication.  The Insured was not reported to have any significant

6

withdrawal symptoms from substances, nor any significant deterioration or emergence of new symptoms during her continuing inpatient hospital stay. For these reasons, the Health Plan's determination should be upheld[.]

(AR 566, 606.)

At that point, Plaintiffs had exhausted their administrative appeal rights, so they filed the present lawsuit.

## LEGAL STANDARDS

### I.     Summary Judgment Standard

In general, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). But in an ERISA case where both parties have moved for summary judgment, "summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor." LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan, 605 F.3d 789, 796 (10th Cir. 2010).

### II.     Standard of Review for Denial of Benefits

A denial of benefits challenged under ERISA "is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). It is undisputed that based on the Plan, Health Net has the discretionary authority to make claims decisions. See Eugene S. v. Blue Cross Blue Shield of N.J., 663 F.3d 1124, 1132 (10th Cir. 2011); Pls.' Opp'n to Defs.' Mot. Summ. J. at 14, ECF No. 53. For this reason, Defendants contend that a deferential arbitrary and capricious standard is

7

appropriate.  But Plaintiffs argue that the court should apply de novo review.  According to

Plaintiffs, Defendants have forfeited arbitrary and capricious review because their consideration

of Plaintiffs' claims was marked by serious procedural errors.

Even when a plan gives an administrator discretionary authority, the administrator can

lose the benefit of arbitrary and capricious review if it does not "valid[ly] exercise . . . that

discretion."  Rasenack v. AIG Life Ins. Co., 585 F.3d 1311, 1315 (10th Cir. 2009) (quoting

Gilbertson v. Allied Signal Inc., 328 F.3d 625, 631 (10th Cir. 2003)).  The Tenth Circuit has

"applied de novo review where deferential review would otherwise be required in the face of

serious procedural irregularities."  Martinez v. Plumbers & Pipefitters Nat'l Pension Plan, 795

F.3d 1211, 1214 (10th Cir. 2015); see also LaAsmar, 605 F.3d at 798; Kellogg v. Metro. Life Ins.

Co., 549 F.3d 818, 825–27 (10th Cir. 2008).

In Gilbertson, the Tenth Circuit addressed the impact of procedural irregularities on

judicial review.  The court applied the 1977 version of the ERISA regulations and concluded that

when a plan administrator fails to exercise its discretion—by neglecting to make a timely

decision, for example—the claim is deemed denied and the district court owes no deference to

the administrator.  328 F.3d at 630–31.  But the court went on to explain that a plan administrator

may be spared this rigorous standard if it "substantially complied" with the regulations.  Id. at

634–35.

The ERISA regulations were amended in 2002, and the Tenth Circuit has not yet decided

whether the new regulations (the "2002 regulations") affect its substantial compliance analysis

under Gilbertson.  Instead, the Tenth Circuit has repeatedly reserved that issue.  See, e.g.,

LaAsmar, 605 F.3d at 800; Hancock v. Metro. Life Ins., 590 F.3d 1141, 1152 n.3 (10th Cir.

2009).  Nevertheless, "in the context of an ongoing, good faith exchange of information between

the administrator and the claimant, inconsequential violations of the deadlines or other procedural irregularities would not entitle the claimant to de novo review." Rasenack, 585 F.3d at 1317 (citing Gilbertson, 328 F.3d at 634).  And although the Tenth Circuit has questioned the continued viability of the substantial compliance test, "it remains precedent to not apply a hair-trigger rule requiring de novo review whenever the plan administrator, vested with discretion, failed in any respect to comply with the procedures mandated by this regulation." J.L. v. Anthem Blue Cross, 510 F. Supp. 3d 1078, 1086 (D. Utah 2020) (emphasis in original) (internal quotation marks omitted) (quoting LaAsmar, 605 F.3d at 799).

The court must therefore determine whether Defendants substantially complied with ERISA's procedural regulations.  The 2002 regulations set forth the requirements for internal claims and appeals procedure.  The plan administrator has an obligation to provide the claimant with sufficient notification of an adverse benefit determination:

> The notification shall set forth, in a manner calculated to be understood by the claimant—
>
> > (i) The specific reason or reasons for the adverse determination;
> >
> > (ii) Reference to the specific plan provisions on which the determination is based;
> >
> > (iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;
> >
> > (iv) A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review;
> >
> > (v) In the case of an adverse benefit determination by a group health plan—
> >
> > > (A) If an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse

> determination, either the specific rule, guideline, protocol, or other similar criterion; or a statement that such a rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of such rule, guideline, protocol, or other criterion will be provided free of charge to the claimant upon request . . . .

29 C.F.R. § 2560.503-1(g)(1).  Further, the 2002 regulations require plan administrators to

provide claimants with "a reasonable opportunity to appeal an adverse benefit determination"

through a process that must:

> (ii) Provide claimants the opportunity to submit written comments, documents, records, and other information relating to the claim for benefits;
>
> (iii) Provide that a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits. Whether a document, record, or other information is relevant to a claim for benefits shall be determined by reference to paragraph (m)(8) of this section;
>
> (iv) Provide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination."

Id. § 2560.503-1(h)(2).

> The regulations explain when an internal claims and appeals process is deemed exhausted

without the exercise of the plan administrator's discretion:

> (1) In the case of a plan or issuer that fails to strictly adhere to all the requirements of this paragraph (b)(2) with respect to a claim, the claimant is deemed to have exhausted the internal claims and appeals process of this paragraph (b), except as provided in paragraph (b)(2)(ii)(F)(2) of this section. . . . If a claimant chooses to pursue remedies under section 502(a) of ERISA under such circumstances, the claim or appeal is deemed denied on review without the exercise of discretion by an appropriate fiduciary.
>
> (2) Notwithstanding paragraph (b)(2)(ii)(F)(1) of this section, the internal claims and appeals process of this paragraph (b) will not be deemed exhausted based on de minimis violations that do not cause, and are not likely to cause, prejudice or harm to the claimant so long as the plan or issuer demonstrates that the violation was for good cause or due to matters beyond the control of the plan or issuer and that the violation occurred in the context of an ongoing, good faith exchange of information between the plan and the claimant.

Id. § 2590.715-2719(b)(2)(ii)(F).  In sum, these procedures require that the appeals process must represent "a meaningful dialogue between ERISA plan administrators and their beneficiaries." Gilbertson, 328 F.3d at 635 (quoting Booton v. Lockheed Med. Benefit Plan, 110 F.3d 1461, 1463 (9th Cir. 1997)).

According to Plaintiffs, seven procedural deficiencies warrant de novo review.  The first procedural problem identified by Plaintiffs is that Health Net's internal reviewer was not qualified.  This point is particularly unpersuasive.  Plaintiffs cite to Health Net's July 16, 2018 appeal response letter, which described the reviewer as "board certified in Obstetrics and Gynecology."  Through an affidavit of the reviewer, Health Net explains in its briefs that the reference was an unfortunate typographical error.  (Aff. of Dr. Andrei Jaeger ¶ 9, ECF No. 44-1.) The reviewer was not an OB/GYN, but a board-certified psychiatrist with "forty-two years of experience in behavioral health, including as an assistant professor of clinical psychiatry at Columbia University and chief of an intensive care inpatient treatment unit at a psychiatric hospital in New York."  (Defs.' Mot. Summ. J. at 9, ECF No. 44.)  Plaintiffs ignore Health Net's simple explanation.  They assert that the affidavit is improper extra-record evidence that the court may not consider and consequently, the court must take at face value the fiction that the reviewer was an OB/GYN.  Contrary to Plaintiffs' position, the affidavit is proper evidence,[3] and it demonstrates the reviewer was indeed qualified to make the decision.

---

[3] Plaintiffs object to Defendants' use of affidavits.  Caselaw generally holds that the court is prohibited from considering materials that were not before the administrator.  Murphy v. Deloitte & Touche Grp. Ins. Plan, 619 F.3d 1151, 1159 (10th Cir. 2010).  That rule applies to consideration of the claimant's eligibility for benefits.  The Tenth Circuit has qualified that rule.  "Although we have frequently used broad language to describe our restriction on extra-record discovery and supplementation, the breadth of that language can be misleading, at least to some degree. . . . Specifically, the broad language prohibiting extra-record evidence is potentially misleading in cases involving a dual role conflict of interests or procedural irregularities."  Id. at 1159–60 (emphasis added).  Here, Health Net submitted the affidavit to correct an error and counter Plaintiffs' claim of procedural irregularities.  It does not submit the affidavit to support its substantive decision that I.W. is not eligible for benefits.  Accordingly, the court may consider Dr. Jaeger's sworn statement and other statements submitted by Defendants.

Second, Plaintiffs argue that Health Net did not reveal the reviewers' identities and credentials.  ERISA does not require the Plan administrator to automatically reveal the reviewer's identity and credentials.  The Plan need only "[p]rovide for the identification" of a medical reviewer.  29 C.F.R. § 2560.503-1(h)(3)(iv).  In their letter to the Arizona Department of Insurance, Plaintiffs asked for the future external reviewer's "identifying credentials."  (AR 6803.)  Once the review was complete, MAXIMUS wrote that the reviewer was a "Medical Expert in Psychiatry" who was actively practicing and unaffiliated with the Plan.  (AR 605.)  Beyond this interaction, Plaintiffs have not presented evidence that they requested other reviewers' credentials or that Health Net denied any such request.  In fact, Plaintiffs' only articulated complaint is that the "Obstetrician/Gynecologist . . . was anonymous."  (Pls.' Mot. Summ. J. at 25, ECF No. 48; Pls.' Opp'n to Defs.' Mot. Summ. J. at 14–15, ECF No. 53.)  To the extent that Health Net failed to identify Dr. Jaeger and mislabeled him as an OB/GYN physician, there was no substantive harm.  As stated above, Dr. Jaeger was more than qualified to review I.W.'s appeal and help ensure a full and fair review.

Third, Plaintiffs argue that Health Net did not apply the Plan's standards but instead improperly relied solely on the "InterQual" criteria.   But Health Net did not base its decision solely on the InterQual criteria.  For instance, the March 1, 2017 denial letter cites to Plan terms and standards, including "medical necessity criteria."  (AR 105–06.)  Additionally, the InterQual criteria are generally accepted standards that embody the "medical necessity" standard incorporated by the Plan.  See Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc., 852 F.3d 105, 114 (1st Cir. 2017) ("[T]he InterQual criteria . . . are nationally recognized, third-party guidelines."); Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc., 877 F.3d 687, 690 (6th

Cir. 2017) ("The InterQual Criteria were written by a panel of 1,100 doctors and reference 16,000 medical sources.").

Fourth, Plaintiffs argue that Health Net did not consider their documentation and arguments. Statements by the internal and external reviewers demonstrate that this is untrue. (See AR 621, 628–30, 605.) Additionally, despite Plaintiffs' complaint that reviewers did not specifically address their arguments, ERISA does not require the reviewer to respond affirmatively to claimant arguments. See Niedens v. Cont'l Cas. Co., 258 F. App'x 216, 220 (10th Cir. 2007).

Fifth, Plaintiffs argue that Health Net did not engage in a meaningful dialogue when it used the very same language in its first denial letter to drafts its denial in the second letter. The question is whether the reviewers adequately considered the arguments, not how they articulated the decision. A cursory denial is sufficient if it communicates the points required by ERISA (i.e., the reason for denial, citation to the relevant Plan provisions, an articulation of the reviewer's "clinical judgment," and information about the appeal process). See Mark M. v. United Behav. Health, No. 2:18-cv-00018-BSJ, 2020 WL 5259345, at *8 (D. Utah Sept. 3, 2020) (citing 29 C.F.R. § 2560.503-1(g)–(h)). To the extent the second denial letter does not contain a sufficient explanation for the denial (and it does, albeit in a perfunctory manner, (AR 6981–82)), the substantial compliance standard would excuse this deficiency considering Defendants' other efforts.

Sixth, Plaintiffs argue that Health Net did not provide Plaintiffs the information necessary to perfect their appeal. However, the record shows that Health Net not only provided written information about the appeal process (for example, a copy of the InterQual criteria), but Plaintiffs submitted and discussed the types of records Health Net said would be necessary in an

appeal.  (AR 633, 6949.)  Here, a successful appeal would have required Plaintiffs to prove that I.W. satisfied the InterQual criteria.  Plaintiffs' inability to successfully appeal has no bearing on whether Health Net met its procedural duties.

Finally, Plaintiffs argue that Health Net failed to provide a denial within ninety days of the claim.  In February 2017, Uinta apparently requested continued authorization for I.W.'s stay (up until then, Health Net had authorized her stay).  (AR 125.)  Health Net decided to conduct a peer-to-peer review of her coverage.  Upon a psychiatrist's review of I.W.'s progress (through records from Uinta and a discussion with her treating psychiatrist), Health Net determined on March 1, 2017, that she no longer needed care at a twenty-four-hour/seven-day-a-week mental health residential treatment facility.  (AR 142.)  On March 1, 2017, Health Net mailed its decision letter to the address on file for Plaintiffs.  (Aff. of Katherine Hughan ¶ 2, ECF No. 44-2; AR 144–45.)

Health Net also informed Uinta of the denial and its reasoning.  Uinta agreed to tell I.W.'s parents that Health Net had declined to coverage treatment after February 23, 2017.  (AR 144.)  All of that occurred within ninety days of Uinta's request for continued coverage.  On May 10, 2018, I.W.'s mother wrote to Health Net's internal appeal department saying she never received the denial letter and that she could not properly appeal the denial because she did not have information about how Health Net made its decision.  (AR 633.)  She attached approximately 1,600 pages of I.W.'s medical records to the letter.  On June 8, 2018, Health Net gave her another copy of the denial letter (which told Plaintiffs they had two years to appeal the decision), the InterQual criteria, and other documentation.  (AR 2253–61.)  It then gave Plaintiffs an opportunity to submit more documents and argument based on those materials.  With the new documentation from Plaintiffs, Health Net conducted another review and denied the claim (for a

second time) on June 6, 2018.  (AR 630–31.)  Under the circumstances, any delay was harmless because it did not prejudice Plaintiffs.  The record shows that Plaintiffs submitted documentation in support of their appeal long before the two years had expired.  All of that indicates Plaintiffs had a full and fair opportunity to challenge the denial on appeal.

In sum, the court finds that Health Net substantially complied with its procedural obligations.  Accordingly, Plaintiffs are not entitled to the de novo review they seek.  Arbitrary and capricious review is appropriate for Plaintiffs' § 1132(a)(1)(b) claim.

## ANALYSIS

Plaintiffs have one surviving cause of action under ERISA: a claim for recovery of benefits under § 1132(a)(1)(b).  Plaintiffs cannot prevail on this claim.

Section 1132(a)(1)(b) allows a plan beneficiary to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(b).  When reviewing a plan administrator's decision to deny benefits, a court will "consider only the rationale asserted by the plan administrator in the administrative record and determine whether the decision, based on the asserted rationale, was arbitrary and capricious."  Weber v. GE Grp. Life Assurance Co., 541 F.3d 1002, 1011 (10th Cir. 2008).  The court will make that determination based on the language of the plan.  Id.

Under the arbitrary and capricious review standard, the court must affirm Health Net's medically necessity determination if it is "predicated on a reasoned basis" and based on "substantial evidence in the record."  Eugene S., 663 F.3d at 1134.  Health Net's decision need not "be the only logical one or even the superlative one."  Id.  It need only "fall[] somewhere on

a continuum of reasonableness—even if on the low end." Stacy S. v. Boeing Co. Emp. Health Benefit Plan (Plan 626), 344 F. Supp. 3d 1324, 1337 (D. Utah 2018).

Plaintiffs raise three points in support of their position that Health Net's decision was arbitrary and capricious. First, Plaintiffs assert that I.W.'s treatment was medically necessary because it satisfied InterQual criteria. Second, they argue that Health Net disregarded the views of I.W.'s treating professionals. Finally, they say Health Net failed to cite to specific provisions of the Plan and did not explain its factual findings.

To begin, Plaintiffs assert that I.W.'s condition satisfied the InterQual criteria for residential treatment. In their opposition, Plaintiffs provide a long list of InterQual criteria addressing eating disorders and complain that Defendants selectively chose only a smattering of the applicable criteria, an effort that conveniently supported denial. (See Pls.' Opp'n to Defs.' Mot. Summ. J. at 6, ECF No. 53.) Then they argue that I.W.'s condition met other criteria, so the treatment was medically necessary. (See id. at 22–26.) Defendants respond that Plaintiffs' arguments "regarding InterQual's eating disorder criteria and their alleged 'truncat[ion]'—are newly minted for this litigation. These arguments appear nowhere in Plaintiffs' 31-page external appeal letter." (Defs.' Reply in Support of Mot. Summ. J. at 13, ECF No. 58.) Defendants are correct.

As Defendants suggest, the court must disregard Plaintiffs' "medically necessary" argument because ERISA "does not give claimants a do-over in federal court whenever they come up with new reasons for why they believe a plan administrator's expert internal and external reviewers were wrong." (Defs.' Reply at 14, ECF No. 58 (citing Sandoval v. Aetna Life & Cas. Ins. Co., 967 F.2d 377, 381 (10th Cir. 1992)). The Sandoval court specified that when a district court is reviewing whether a plan administrator's decision was arbitrary and capricious,

"the district court generally may consider only the arguments and evidence before the administrator before the administrator at the time it made that decision."  967 F.2d at 380.  Put a different way,

> [i]f a plan participant fails to bring evidence to the attention of the administrator, the participant cannot complain of the administrator's failure to consider this evidence.  [The plaintiff] is not entitled to a second chance to prove [he is entitled to coverage]. . . . In effect, a curtain falls when the fiduciary completes its review, and for purposes of determining if substantial evidence supported the decision, the district court must evaluate the record as it was at the time of the decision.

Id. at 381 (alterations added).  Accordingly, Plaintiffs are limited to arguments they made during the appeals process.  Those did not include a discussion of different InterQual criteria to support their argument that treatment at Uinta was medically necessary.  The court need not address this portion of Plaintiffs' challenge to Health Net's decision.

Next, Plaintiffs argue that Health Net disregarded the views of I.W.'s treating professional, but the record before the court shows the reviewing physicians did not ignore the treating physician's opinions.  Dr. Antonacci did a peer-to-peer review with I.W.'s psychiatrist at Uinta, Dr. Marshall.  Only after that did she find that I.W.'s continued residential stay was not medically necessary.  And at each subsequent step in the review process, the reviewers considered the full range of records before them, including the opinions and notes of I.W.'s treating physician.

Lastly, contrary to Plaintiffs' argument, the denial letters all refer to sections of the Plan and its coverage of "medically necessary" services.  For example, the first denial letter specifically cites to the Plan's Evidence of Coverage, Exclusions, and Limitations sections, which explain that the Plan does not cover "non-medically necessary services."  (AR 491.)  The reviewers on appeal also state in their denial decisions that extended treatment at Uinta was not "medically necessary," a term the Plan uses to describe the extent of coverage.  Additionally,

they sufficiently explain, albeit in a barebones fashion, their reasons for denial.  Under ERISA's lenient standard, Health Net did not need to provide more than that.

Health Net's decision was not arbitrary and capricious.  Four psychiatrists reviewed the record, which included Plaintiffs' documentation and notes from Dr. Antonacci's peer-to-peer review with I.W.'s treating physician.  Each independently concluded that treatment at Uinta, when measured against the InterQual criteria, was not medically necessary at that time.  Each explained its clinical rationale for their decisions.  Given that record, the court concludes that Health Net based its determination on substantial evidence and provided a reasoned basis for denial.  See Tracy O. v. Anthem Blue Cross Life & Health Ins., 807 F. App'x 845, 854 (10th Cir. 2020) (noting that plaintiff would have a difficult time showing that a decision supported by four doctors was "not grounded on any reasonable basis" (quoting Kimber v. Thiokol Corp., 196 F.3d 1092, 1098 (10th Cir. 1999))).  The lenient standard of review only requires the decision to "fall[] somewhere on a continuum of reasonableness—even if on the low end."  Stacy S., 344 F. Supp. 3d at 1337.  Health Net satisfied that standard.

## **CONCLUSION**

For the reasons above, the court GRANTS Defendants' motion for summary judgment (ECF No. 44) and DENIES Plaintiffs' motion for summary judgment (ECF No. 48).  Summary judgment is awarded in favor of Defendants Health Net Life Insurance Company and Health Net of Arizona, Inc.

DATED this 10th day of September, 2021.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
U.S. District Judge

18