UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| E.W. and I.W.,<br><br>        Plaintiffs,<br><br>v.<br><br>HEALTH NET LIFE INSURANCE<br>COMPANY and HEALTH NET OF<br>ARIZONA, INC.,<br><br>        Defendants. | **REDACTED**<br><br>**MEMORANDUM DECISION AND<br>ORDER GRANTING IN PART AND<br>DENYING IN PART [109]<br>DEFENDANTS' MOTION FOR<br>SUMMARY JUDGMENT AND<br>DENYING [116] PLAINTIFFS' MOTION<br>FOR SUMMARY JUDGMENT**<br><br>Case No. 2:19-cv-00499-DBB-DBP<br><br>District Judge David Barlow |

This matter is before the court on remand from the Tenth Circuit[1] on E.W. and I.W.'s (collectively, "Plaintiffs") claim that Defendants Health Net Insurance Company and Health Net of Arizona, Inc. (collectively, "Health Net" or "Defendants") wrongly denied coverage under the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA" or the "Parity Act").[2] Both parties have filed cross-motions for summary judgment.[3] For the reasons below, the court grants in part and denies in part Defendants' motion, and denies Plaintiffs' motion.[4]

---

[1] Post-remand, the presiding judge recused, and the case was randomly reassigned.
[2] *See E.W. v. Health Net Life Ins. Co.*, 86 F.4th 1265 (10th Cir. 2023).
[3] Defs.' Mot. for Summ. J. ("Defs.' MSJ"), ECF No. 109, filed Aug. 14, 2025; Pls.' Mot. for Summ. J. ("Pls.' MSJ"), ECF No. 116, filed Aug. 15, 2025.
[4] Having considered the parties' arguments and applicable law, the court finds that oral argument would not materially assist the court in reaching a decision. *See* DUCivR7-1(g).

## BACKGROUND

*Plan Coverage and Relevant Guidelines*

Plaintiff E.W. was a participant in an employer-sponsored health insurance plan (the "Plan") issued by Health Net and governed by the Employee Retirement Income Security Act of 1974 ("ERISA").[5] E.W.'s daughter, I.W., was a beneficiary of the Plan.[6] Health Net is the Plan's claims administrator.[7]

The Plan defines a "Residential Treatment Center" ("RTC") as a "twenty-four hour, structured and supervised group living environment for children, adolescents or adults where psychiatric, medical and psychosocial evaluation can take place, and distinct and individualized psychotherapeutic interventions can be offered to improve their level of functioning in the community."[8] Relevant to the Plaintiffs' claim, the Plan also covers services at a skilled nursing facility ("SNF"), which the Plan defines as an "extended care Facility which is licensed . . . and operated in accordance with the laws of the state."[9]

Other than preventative services, the Plan only covers services that are "[m]edically [n]ecessary," which it defines as

> health care services that a Physician, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an Illness, Injury, disease or its symptoms, and that are:
>
> 1. In accordance with generally accepted standards of medical practice;
>
> 2. Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's Illness, Injury of disease; and

---

[5] *See generally* 29 U.S.C. §§ 1001–1461.
[6] Defs.' Motion 3.
[7] Defs.' Motion 3; Pls.' Motion 3.
[8] AR 350. For ease of identification, the court refers to the Bates-numbered administrative record as "AR" followed by the number.
[9] AR 351.

3. Not primarily for the convenience of the patient, Physician, or other health care provider, and not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's Illness, Injury or disease.[10]

The Plan defines "generally accepted standards of medical practice" as "standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, Physician Specialty Society recommendations, the views of Physicians practicing in relevant clinical areas and any other relevant factors."[11]

Though not delineated in the Plan, a "primary source" Health Net used during the relevant time period to determine whether continued care at an RTC is medically necessary was the McKesson InterQual Behavioral Health 2016.3 Child and Adolescent Psychiatry Criteria ("InterQual Criteria").[12] Under the InterQual Criteria, continuation of care at an RTC after ███████ is medically necessary if the ████████████████████████████████ ████████████████████████████████████.[13]

For an ██████████, the patient must display one of the following:



---

[10] AR 537.
[11] *Id.*
[12] Defs.' MSJ, Ex. 1 at 6; Pls.' Opp'n to Mot. for Summ. J. 14 ("Pls.' Opp'n"), ECF No. 132, filed Oct. 7, 2025; *E.W. v. Health Net Life Ins. Co.*, 86 F.4th 1265, 1274–76 (10th Cir. 2023).
[13] *E.W.*, 86 F.4th at 1276.



For ████████████████, a patient must display one of the following:

Also relevant for Parity Act purposes is the Plan's criteria for medically necessary care at a SNF. Similar to RTC criteria, medical necessity under the SNF criteria "████████████████ ████████████████████████████████████████████████████████".[16] The SNF guidelines require patient evaluation on a ████ basis.[17] The guidelines also provide that before a patient may be discharged, they must meet ████ of the following criteria:

---

[14] AR 37.
[15] AR 37–38.
[16] Defs.' MSJ, Ex. 2 at 6.
[17] *Id.* at 7; AR 10045.



[18]

The "▮▮▮▮▮▮▮▮" criteria focus on whether "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."[19] They also require a patient to satisfy ▮▮▮▮▮▮▮▮▮ criteria—including ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮"[20]

*I.W.'s Treatment*

I.W. began to struggle with anxiety, depression, and anorexia around 2013.[21] In 2015, a psychiatrist diagnosed I.W. with "[m]ajor depression" and "[g]eneralized anxiety disorder."[22]

---

[18] Defs.' Opp'n to Mot. for Summ. J. 14 ("Defs.' Opp'n"), Ex. 21 at 10049–51, ECF No. 129, filed Oct. 7, 2025.
[19] *Id.* at 10049–50.
[20] *Id.* at 10046–47.
[21] AR 7029–30.
[22] *Id.* 7034–36.

After multiple suicide attempts, I.W.'s psychiatrist recommended that I.W. receive "a higher level of care."[23]

On September 12, 2026, I.W. was admitted to Uinta, an adolescent mental health residential treatment center.[24] Beginning January 1, 2017, I.W.'s treatment was covered by the Plan.[25] Health Net authorized I.W.'s residential treatment through February 22, 2017.[26]

During that month, I.W.'s treatment team discovered that she had been displaying inappropriate sexual behavior with one of her peers and had recently drunk Benadryl and cough syrup.[27] On February 14, 2017, I.W.'s treatment team noted I.W. "will not be going home for her first home visit this month," and stated, "[I.W.] is in relapse and continues to need a structured and supervised environment to be able to relapse in a safe environment. Her behaviors would have been much more dangerous if she had been home."[28]

Toward the end of February, Health Net engaged Dr. Diana Antonacci, affiliated with an independent review organization, to conduct a peer-to-peer assessment of I.W. with her Uinta psychiatrist.[29] After reviewing I.W.'s medical records and discussing I.W.'s treatment at Uinta with her psychiatrist there, Dr. Antonacci made the following findings in her review:

1. The patient has no suicidal or homicidal ideation. There are no psychotic symptoms. There is no evidence of grave disability. There has been no recent aggression of severe agitation. There are no severe mood symptoms.

---

[23] Pls.' MSJ ¶ 30.
[24] AR 4573.
[25] *Id.* 125–34. From September 12, 2016 through December 31, 2016, an insurance provider that is not a party to this litigation covered I.W.'s treatment. *See* AR 126.
[26] *Id.* 125–34.
[27] *Id.* 3350, 3397.
[28] *Id.* 3393, 3397.
[29] *Id.* 138–41; ECF No. 67 at 17.

2.  There are no comorbid substance use concerns. There are no significant medical problems. The patient is compliant with medications. No side effects are documented.

3.  The patient's family has been active and involved in her care. She has had off-campus visits. Her first home visit was cancelled. The patient is compliant with treatment. She is showing evidence of using coping skills.[30]

She concluded her review with the following opinion:

> [InterQual Criteria] for continued stay at mental health residential treatment level of care are not met as of 2/23/17. There is no evidence that the patient continues to require 24-hour-a-day/7-day-a-week supervision to make progress in her goal areas. There is no evidence that she could not receive support and access to therapeutic services outside of a residential setting. Care could continue in a less restrictive setting. Treatment at intensive outpatient level of care could be considered.[31]

Dr. Jay Butterman, a Health Net-affiliated psychiatrist, agreed with Dr. Antonacci's findings after reviewing them along with I.W.'s case records and medical records during her time at Uinta.[32] It was also determined that three nearby facilities offering intensive outpatient care to adolescents had availability.[33]

Health Net denied coverage effective February 23, 2017 because it determined that I.W.'s residential treatment was no longer medically necessary.[34] On March 1, 2017, Health Net notified Plaintiffs of its decision to discontinue coverage in a letter that included Dr. Butterman's signature and stated they had evaluated I.W.'s "health condition in relation to InterQual criteria"

---

[30] *Id.* 2253–61; *See also id.* 141.
[31] *Id. See also id.* 142.
[32] *Id. See also id.* 140–42.
[33] *Id. See also id.* 139.
[34] *Id. See also id.* 105–06.

and determined that her ongoing treatment at Uinta "does not meet medical necessity criteria."[35] The letter went on to explain that

> [t]hese standards state that there must be ███████████████████
> ██████████████████████████████████████
> Based on the clinical information provided to [Defendants], [I.W.] is not having any of these symptoms or behaviors. It is reported that she has learned many healthy coping skills and is working on strategies to control her anxiety. She has been opening up significantly in therapy and is no [sic] beginning to address core issues related to her poor self-image and thinking errors. Therefore, this request for ongoing treatment at [Uinta] does not meet medical necessity criteria.[36]

Plaintiffs allegedly did not receive the March 2017 denial letter, and I.W. remained at Uinta for nine more months until she was discharged on December 14, 2017.[37] On May 10, 2018, Plaintiffs notified Health Net they had not received the March 2017 letter, appealed Health Net's denial of coverage, and requested that Health Net "complete a full and fair review of [I.W.'s] medical records, included with this letter, and issue a valid determination letter" of I.W.'s treatment.[38] Health Net replied on June 8, 2018, including the March 2017 denial-of-coverage letter and notifying Plaintiffs that it would review its determination.[39]

Health Net then assigned Dr. Andrei Jaeger, an affiliated psychiatrist, to review I.W.'s medical records.[40] After his review, Dr. Jaeger agreed with Dr. Antonacci and Dr. Butterman that continued treatment at Uinta was not medically necessary.[41] He stated, "In reviewing the rest of the over 1600 pages [of] medical record[s] provided, at no time during her stay after

---

[35] *Id.* 2253–61; *See also id.* 105–106.
[36] *Id.* 2255–56.
[37] *Id.* 163, 2253–61.
[38] *Id.* 3117.
[39] *Id.* 2253–61
[40] *Id.* 621–31.
[41] *Id.* 621.

2/22/2017 documentation was suggestive of a clinical picture supporting medical necessity criteria for [residential treatment center] level of care." He further found, "There was no evidence that she could not receive support and access to therapeutic services outside of a residential setting."[42]

In a letter dated July 16, 2018, Health Net upheld its denial and informed Plaintiffs that Dr. Jaeger had concluded that "InterQual criteria standards state that there must be ████████████ ███████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████"[43] Because "[I.W.] was not having any of these symptoms or behaviors" during the week prior to February 23, 2017, her treatment at Uinta "did not meet medical necessity criteria."[44]

Plaintiffs requested an independent external review of Health Net's denial from the Arizona Department of Insurance.[45] The review upheld Health Net's denial of coverage on the following basis:

> Per InterQual criteria 2016.3 Child and Adolescent Psychiatry Criteria Residential Treatment Center, extended stay there must be ████████████████████ ████████████████████████████████████████████████████████████████████ ████████████ Based on the information provided in the chart, the Insured did not display any of these such behaviors within the specified time. Furthermore, she was not noted to be psychotic, manic, suicidal, homicidal or having symptoms of a major depressive episode. There is no documentation that the Insured had significant ongoing medical problems that required hospital-based interventions or the Insured had functional impairments. There is no evidence in that chart of any significant side effects from medication. The Insured was not reported to have any significant withdrawal symptoms from substances, nor any significant deterioration or emergence of new symptoms during her continuing inpatient

---

[42] *Id.* 602–06. *See also id.* 630.
[43] *Id.* 621–22; 6981–82.
[44] *Id.*
[45] *Id.* 6801.

hospital stay. For these reasons, the Health Plan's determination should be upheld.[46]

*Procedural History*

In July 2019, Plaintiffs filed a Complaint against Health Net, alleging that its denial of coverage violated ERISA and MHPAEA.[47] On May 19, 2020, the court granted Health Net's Motion to Dismiss on the MHPAEA claim and denied it on the ERISA claim.[48] On cross-motions for summary judgment on the ERISA claim, the court granted summary judgment to Health Net.[49]

Plaintiffs appealed to the Tenth Circuit, which affirmed summary judgment for Health Net on the ERISA claim but reversed dismissal of the MHPAEA claim.[50] Recognizing that "[n]either our Circuit nor any others have defined the elements of a MHPAEA claim," the Tenth Circuit set forth a four-part test for a MHPAEA claim.[51] Under it, a plaintiff must (1) "plausibly allege that the relevant group health plan is subject to MHPAEA"; (2) "identify a specific treatment limitation on mental health or substance-use disorder benefits covered by the plan"; (3) "identify medical or surgical care covered by the plan that is analogous to the mental health or substance-use disorder care for which the plaintiffs seek benefits"; and (4) "plausibly allege a disparity between the treatment limitation on mental health or substance use disorder benefits as compared to the limitations that defendants would apply to the medical or surgical analog."[52]

---

[46] *Id.* 604–06.

[47] *See* Compl., ECF No. 2, filed July 16, 2019.

[48] *See* Order and Mem. Decision Granting in Part and Den. in Part Mot. to Dismiss, ECF No. 28, filed May 19, 2020 (issued by previous district judge assigned to the case).

[49] *See* Order and Mem. Decision Granting Defs.' Mot. for Summ. J. & Den. Pls.' Mot. for Summ. J. ("2021 SJ Order"), ECF No. 67, filed on Sept. 10, 2021 (issued by previous judge assigned to the case).

[50] *See E.W.*, 86 F.4th at 1280.

[51] *Id.* at 1281–83.

[52] *Id.* at 1283.

Under the test, the Tenth Circuit concluded that Plaintiffs stated a plausible claim under MHPAEA and remanded the case on that remaining claim.[53]

## STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[54] "When both parties move for summary judgment in an ERISA case, thereby stipulating that a trial is unnecessary, 'summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility of benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor.'"[55]

## DISCUSSION

"MHPAEA is an amendment to ERISA."[56] It was created by Congress "to end discrimination in the provision of insurance coverage for mental health and substance use disorders as compared to coverage for medical and surgical conditions in employer-sponsored group health plans."[57] "The statute requires employer-sponsored group health plans to ensure treatment limitations for mental health benefits 'are no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan . . . and there are no separate treatment limitations that are applicable only . . . to mental

---

[53] *Id.* at 1283–93.
[54] Fed. R. Civ. P. 56(a).
[55] *Michael D. v. Anthem Health Plans of Ky., Inc.*, 369 F. Supp. 3d 1159, 1167 (D. Utah 2019) (quoting *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010)).
[56] *E.W.*, 86 F.4th at 1280; *N.R. ex rel. S.R. v. Raytheon Co.*, 24 F.4th 740, 746 (1st Cir. 2022).
[57] *E.W.*, 86 F.4th at 1280 (quoting *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 356 (2d Cir. 2016).

health . . . benefits.'"[58] "Disparate treatment limitations that violate the Parity Act can be either *facial* (as written in the language or the processes of the plan) or *as-applied* (in operation via application of the plan)."[59]

Plaintiffs assert Health Net's use of the InterQual Criteria violated MHPAEA both facially and as-applied. Plaintiffs allege the InterQual Criteria are more stringent in evaluating medical necessity than generally accepted standards of care for residential mental health treatment because they require more acute symptoms than the skilled nursing guidelines, and that Health Net misstated and misapplied the InterQual Criteria.[60]

## I.   Standing

Before the court can address Plaintiffs' arguments, it must determine whether Plaintiffs have standing on the MHPAEA claim.[61] "Absent an assurance that jurisdiction exists, a court may not proceed in a case."[62] "The requirement that a plaintiff have standing 'is grounded in Article III of the U.S. Constitution, which restricts federal court adjudication to actual cases or controversies.'"[63] "There is no ERISA exception to Article III."[64]

"A plaintiff bears the burden of establishing Article III standing by showing (1) they have suffered an 'injury in fact' that is 'concrete and particularized' and 'actual or imminent'; (2) the injury is 'fairly . . . traceable to the challenged action of the defendant'; and (3) the injury is

---

[58] *M.S. v. Premera Blue Cross*, 118 F.4th 1248, 1260 (10th Cir. 2024) (quoting 29 U.S.C. § 1185a(a)(3)(A)(ii)).
[59] *Brian J. v. United Healthcare Ins. Co.*, 667 F. Supp. 3d 1124, 1135 (D. Utah 2023) (citation omitted).
[60] Pls.' MSJ 28–33, 34–39.
[61] *See* Defs.' MSJ 17–25.
[62] *Chieftain Royalty Co. v. SM Energy Co.*, 100 F.4th 1147, 1161 (10th Cir. 2024) (quoting *Cunningham v. BHP Petrol Gr. Brit. PLC*, 427 F.3d 1238, 1245 (10th Cir. 2005)).
[63] *M.S.*, 118 F.4th at 1260 (quoting *Utah Ass'n of Cntys. v. Bush*, 455 F.3d 1094, 1098 (10th Cir. 2006)).
[64] *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 547 (2020).

likely to 'be redressed by a favorable decision by the court."[65] "To satisfy the traceability requirement, the defendant's conduct must have caused the injury."[66] The "denial of healthcare benefits is a concrete and particularized injury for purposes of establishing Article III standing."[67] But to satisfy causation, a claimant must show a "nexus between the allegedly violative language and [the plan administrator]'s decision to deny benefits."[68]

In *M.S. v. Premera Blue Cross*, the Tenth Circuit recently addressed standing in the context of a denial-of-benefits Parity Act claim and held that an injury is not traceable to a defendant's alleged Parity Act violation if the denial of benefits would have occurred regardless of the alleged Parity Act violation.[69] Based on this holding, the Tenth Circuit reversed the district court's grant of summary judgment to the plaintiffs and remanded for dismissal of the claim for lack of standing.[70]

Plaintiffs try to distinguish *M.S.* on the basis that its denial letters were more detailed and contained grounds independent from the InterQual Criteria for denying the claims, unlike the denial letters in this case.[71] Although Plaintiffs are correct that the denial letters here largely rely on the InterQual Criteria, the more important distinction is why the Tenth Circuit found no standing on the Parity Act claim. *M.S.* reached the Tenth Circuit with unrebutted findings by the district court at the summary judgment stage that "residential treatment care was not deemed medically necessary under the Plan's terms, *even without application of the InterQual*

---

[65] *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

[66] *Benham v. Ozark Materials River Rock, LLC*, 885 F.3d 1267, 1273 (10th Cir. 2018).

[67] *M.S.*, 118 F.4th at 1262.

[68] *Jonathan Z.*, 2:18-cv-00383, 2022 WL 2528362, at *18 (D. Utah July 7, 2022) (citing *Lujan*, 504 U.S. at 560–61).

[69] *See M.S.*, 118 F.4th at 1263 (holding that "Plaintiffs have thus failed to demonstrate that the denial of benefits is fairly traceable to the challenged action of the defendant.").

[70] *Id.* at 1264, 1273.

[71] Pls.' Opp'n 23.

*Criteria*."[72] Because this finding was unchallenged by the parties, the Tenth Circuit "accept[ed]

the district court's finding that Plaintiffs still would have suffered an alleged injury—the denial

of benefits—even if Defendants had not violated the Parity Act" and concluded that "Plaintiffs

have thus failed to demonstrate that the denial of benefits is fairly traceable to the challenged

action of the defendant."[73] Accordingly, Plaintiffs had no standing to raise the MHPAEA

claim.[74]

In contrast, there is no such finding here. Rather, the previous district judge upheld

Health Net's determination because the four psychiatrists who reviewed the records "concluded

that treatment at Uinta, when measured against the InterQual Criteria, was not medically

necessary at that time."[75] Unlike *M.S.*, nowhere did the district court expressly conclude that

treatment was not medically necessary "even without application of the InterQual Criteria."[76]

Accordingly, the court finds that Plaintiffs have standing and addresses the merits of the claim

brought before it.

## II.     Merits of the Parity Act Claim

As noted earlier, to establish a Parity Act claim, a plaintiff must:

> (1) [p]lausibly allege that the relevant group health plan is subject to
>      MHPAEA;
>
> (2) identify a specific treatment limitation on mental health or substance-
>     use disorder benefits covered by the plan;

---

[72] *M.S. v. Premera Blue Cross*, 2022 WL 2208927, at *7 (D. Utah June 21, 2022); *M.S.*, 118 F.4th at 1259 (emphasis supplied).
[73] *Id.* at 1262–63, 1273.
[74] *Id.* at 1273.
[75] *E.W. v. Health Net Life Ins. Co.*, 2021 WL 4133950, at *9 (D. Utah Sept. 10, 2021).
[76] *Compare E.W.*, 2021 WL 4133950, at *9 with *M.S.*, 2022 WL 2208927, at *7.

(3) identify medical or surgical care covered by the plan that is analogous to the mental health or substance-use disorder care for which the plaintiffs seek benefits; and

(4) plausibly allege a disparity between the treatment limitation on mental health or substance-use disorder benefits as compared to the limitations that defendants would apply to the medical or surgical analog.[77]

The claimant bears the burden to show by a preponderance of the evidence that a plan's "limitations on mental health care are . . . more restrictive than medical surgical analogs."[78] However, "the Parity Act requires comparability, not equality, between limitations for Residential Treatment Centers and Skilled Nursing Facilities."[79] A court affords no deference to a benefits administrator when reviewing a Parity Act claim "because the interpretation of a statute is a legal question."[80]

Here, it is undisputed that the Plan is subject to the Parity Act and that it covers both mental health care and medical/surgical care.[81] At issue is whether Health Net applied more restrictive limitations on mental health care than on medical/surgical care. Plaintiffs offer three rationales for finding a Parity Act violation. First, they argue the InterQual Criteria deviate from generally accepted standards of treatment for mental health care.[82] Second, they argue the InterQual Criteria are more acute than the generally accepted standards of care for skilled

---

[77] *E.W.*, 86 F.4th at 1283.
[78] *M.Z. v. Blue Cross Blue Shield of Ill.*, No. 1:20-cv-00184, 2023 WL 2634240, at *21 (D. Utah Mar. 24, 2023).
[79] *James C. v. Anthem Blue Cross & Blue Shield*, 2:19-cv-38, 2021 WL 2532905, at *20 (D. Utah June 21, 2021).
[80] *Joseph F. v. Sinclair Servs. Co.*, 158 F. Supp. 3d 1239, 1258 (D. Utah 2016).
[81] Pls.' MSJ 26.
[82] *Id.* 28–29.

nursing facilities ("SNF").[83] Third, Plaintiffs argue Health Net misapplied the InterQual Criteria.[84] The court addresses each rationale in turn.

### A. Plaintiffs Have Not Established That InterQual Criteria Are Not Generally Accepted Standards of Care for Residential Mental Health Treatment

For support of their assertion that the InterQual Criteria for mental health treatment violate the Parity Act, Plaintiffs attach an issue brief from 2025 by the American Medical Association ("AMA") as an exhibit to their Motion for Summary Judgment.[85] Health Net argues the document is inadmissible because it was not produced or identified in discovery.[86] Plaintiffs acknowledge it was not, but they explain they were not aware of the recently created document "until shortly before briefing."[87] The court need not decide the document's admissibility, however, because the three-page document does not sufficiently support the claims Plaintiffs make on this point.

At most, the AMA's three-page "Advocacy Resource Center" brief warns against "financially-based criteria" that "[s]ome health plans" use, endorses criteria it finds suitable, and suggests the "InterQual guidelines for inpatient and resident mental health and substance use disorder treatment" are "not based on professional *medical association* guidelines or recommendations."[88] Other than this cursory reference to the InterQual Criteria, however, the brief does not articulate why InterQual Criteria are not generally accepted standards of care or why they violate the MHPAEA, particularly when MHPAEA regulations allow health plans to

---

[83] Pls.' Opp'n 27.
[84] Pls.' MSJ 34–39.
[85] *See* Pls' MSJ, Ex. A.
[86] Defs.' Opp'n 18.
[87] Pls.' Reply to Mot. for Summ. J. ("Pls.' Reply") 6, ECF No. 141, filed Nov. 12, 2025.
[88] *See* Pls' MSJ, Ex. A (emphasis supplied).

develop medical necessity criteria "based on recommendations made by panels of experts with appropriate training and experience in the fields of medicine involved."[89] Instead, the advocacy brief notes that the InterQual criteria are not based on the medical association's guidelines and recommendations.

Furthermore, "[f]ederal courts across the country have recognized the widespread adoption of InterQual Criteria and 'district courts routinely find that InterQual's Criteria comport with generally accepted standards of care.'"[90] With respect to residential mental health treatment, courts have also held that the InterQual Criteria "comport[] with generally accepted standards of care."[91] "The InterQual Criteria were written by a panel of 1,100 doctors and reference 16,000 medical sources."[92] They "were developed by independent companies" and are used by "over 75% of hospitals nationwide."[93] Against this backdrop, Plaintiffs have not adequately established that the InterQual Criteria are not generally accepted standards of medical care for mental health.

## B. InterQual Criteria for Residential Treatment Are Not More Stringent Than Analogous Medical/Surgical Care Criteria

Under the Parity Act, treatment limitations are either quantitative ("QTL") or nonquantitative ("NQTL").[94] "Whereas QTL are expressed numerically (such as 50 outpatient visits per year), NQTL otherwise limit the scope or duration of benefits for treatment under a plan or coverage."[95] NQTLs "include medical management standards limiting or excluding

---

[89] 29 C.F.R. § 2590.712(c)(4) Example 4 (2013) (version in effect during the relevant time).

[90] *S.L. ex rel. J.L. v. Cross*, 675 F. Supp. 3d 1138, 1157 (W.D. Wash. 2023) (quoting *N.F. ex rel. M. R. v. Premera Blue Cross*, No. C20-0956, 2021 WL 4804594, at *4 n.4 (W.D. Wash. Oct. 14, 2021)).

[91] *N.F. ex rel. M.R.*, 2021 WL 4804594, at *4.

[92] *Id.* at *4 n.4.

[93] *N.F.*, 2021 WL 4804594, at *4 n.4 (quoting *Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 877 F.3d 687, 690 (6th Cir. 2017)).

[94] 29 C.F.R. § 2950.712(a).

[95] *E.W.*, 86 F.th at 1281 (cleaned up).

benefits based on medical necessity or medical appropriateness."[96] "[T]he Parity Act requires that nonquantitative treatment limitations for mental health benefits be "*comparable to*" and "applied no more stringently than for medical/surgical benefits."[97]

Plaintiffs allege the InterQual Criteria's requirement that a minor must have an acute symptom within the past ▉▉▉ to qualify for residential treatment is more stringent than SNF guidelines that require a minor's rehabilitation goals to be met or clinical stability achieved before being discharged.[98] In other words, the residential treatment criteria require a ▉▉▉ demonstration of an acute symptom from a patient whereas the SNF criteria do not.[99]

In response, Health Net presents an expert report that states, "The InterQual adolescent behavioral health residential treatment criteria are less stringent than the criteria Health Net applied to any medical/surgical analogue, not more stringent."[100] Plaintiffs fail to challenge the expert's conclusions with either a rebuttal expert or responsive arguments or evidence. Plaintiffs also fail to engage with SNF Pediatric Subacute guidelines language requiring various ▉▉▉ ▉▉▉ requirements be met. On this record, then, the unrebutted evidence demonstrates SNF criteria are at least as stringent as residential treatment criteria: they require evaluation of a patient on a ▉▉▉ basis, whereas residential treatment criteria require only ▉▉▉ evaluation.[101]

---

[96] *S.K. v. United Behavioral Health*, No. 2:18-cv-880, 2023 WL 7221013, at *35 (D. Utah Sept. 29, 2023).

[97] *J.W. v. Blue Cross Blue Shield of Tex.*, No. 1:21-cv-21, 2022 WL 2905657, at *6 (D. Utah July 22, 2022) (quoting 29 C.F.R. § 2590.712(c)(4)(iii) (emphasis in original)).

[98] Pls.' MSJ 32.

[99] In this case, the Tenth Circuit already established that SNFs are a proper medical/surgical analog to mental health residential treatment. *See E.W.*, 86 F.4th at 1287.

[100] Defs.' MSJ, Ex. 2 at 2.

[101] *Id.* at 7–8.

Plaintiffs argue that their situation is similar to that described in two recent cases in this district, which addressed the problem of relying on acute symptoms for subacute residential mental health treatment. In *Jonathan Z. v. Oxford Health Plans*, the court found a Parity Act violation when the defendant required acute symptoms to qualify for residential treatment but not for "comparable medical-surgical treatment."[102] In *S.K. v. United Behavioral Health*, the court similarly concluded that the defendant's denial of residential treatment care "violated the Parity Act by requiring G.K. to be present[ly] suffering from an acute condition—being suicidal—when such an acute condition is not required to receive analogous medical/surgical care at a skilled nursing facility."[103] These cases illustrate how application of criteria that requires acute symptoms for residential treatment but not for skilled nursing facilities can violate the Parity Act.[104]

However, they are ultimately distinguishable. Here, the criteria Health Net applied for continued treatment included acute symptoms, but it also included many more non-acute symptoms. Critically, the criteria required *only* ███████████████████████ to be shown within the preceding ████ for E.W. to qualify for continued residential treatment. And the criteria for each condition included numerous non-acute criteria such as "████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

---

[102] *Jonathan Z.*, 2022 WL 2528362, at *20.
[103] *S.K.*, 2023 WL 7221013, at *38.
[104] *See Jonathan Z.*, 2022 WL 2528362, at *20 (finding a Parity Act violation when the defendant "required acute symptoms—like psychosis or suicidal or homicidal ideation—that would qualify for inpatient hospitalization in order to approve coverage for RTC-level care"); *S.K.*, 2023 WL 7221013, at *38 (concluding that the defendants "violated the Parity Act by requiring G.K. to be present[ly] suffering from an acute condition—being suicidal—when such an acute condition is not required to receive analogous medical/surgical care at a skilled nursing facility").

████████████████████████████████████████████████████████████

████████████[105]

In other words, E.W. was not required, as Plaintiffs contend, to demonstrate an acute symptom every ████ in order for coverage to continue. Instead, she only had to demonstrate ████ ████████████ from either the "████████████" or "████████████████████" criteria. There are ████████████ such criteria.[106] As noted above, while some of the symptoms are acute, many others are subacute. In short, she did not have to show any acute symptom at all. Her continued residential treatment was not covered during the time period in question because she was found not to meet any of the criteria, and because her care could have continued in nearby intensive outpatient therapy.[107] The district court concluded, consistent with the four physicians who had reviewed E.W.'s medical records, that Health Net had a reasoned basis for denying coverage.[108] The Tenth Circuit affirmed.[109]

Finally, as noted above, the SNF guidelines require a patient to satisfy all "████████ ████" criteria—including that ████████████████████████████."[110] Similarly, residential treatment criteria allows a patient to be discharged to an intensive outpatient program even with a "████████████████████████" and ████████████ if ████████████ ████████████████████████████"[111] Thus, both consider, among other things, whether the symptoms are capable of treatment in a less intensive setting. "The fact

---

[105] AR 37–38.
[106] AR 105-106, 140-142, 602-606, 621-622, 2253-2261.
[107] AR 37–38.
[108] *E.W.*, 2021 WL 4133950, at *8-10.
[109] *E.W.*, 86 F.4th at 1294-1302.
[110] Defs.' Opp'n, Ex. 21 at 10046–47.
[111] AR 39–40.

that the guidelines for mental health and medical/surgical treatment impose different thresholds for determining when an illness is severe enough to necessitate treatment is not an impermissible disparity [under the Parity Act]."[112] A violation occurs if the guidelines "contain or impose separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits."[113] On this record, the residential treatment and SNF criteria both align with generally accepted standards of care and focus on whether the patient's symptoms warrant treatment in a daily, round-the-clock facility or a less intensive setting.[114] Moreover, the criteria used in the denials are "comparable" to the SNF guidelines as both guidelines evaluate whether a patient is currently experiencing qualifying symptoms or is clinically stable for discharge.[115] This meets the Parity Act's comparability requirement.[116]

Accordingly, Plaintiffs have not shown that the InterQual Criteria for residential treatment are more stringent than SNF criteria. Conversely, Defendants provided unrebutted evidence that the InterQual criteria are not more stringent.

### C. Health Net Did Not Misapply the InterQual Criteria

Next, Plaintiffs argue that Health Net's denial letters "improperly truncate and misapply" the InterQual Criteria.[117] However, the Tenth Circuit already considered and rejected this argument on appeal.[118] After rejecting Plaintiffs' allegation that the reviewers "cherry picked"

---

[112] *James C.*, 2021 WL 2532905, at *20.

[113] *G.W.-S. v. United Healthcare Ins.*, 2024 WL 3652029, at *29 (D. Utah Aug. 5, 2024).

[114] AR 39–40; Defs.' Opp'n, Ex. 21 at 10049–51.

[115] *See J.W.*, 2022 WL 2905657, at *6 (quoting 29 C.F.R. § 2590.712(c)(4)(iii)).

[116] *See J.W.*, 2022 WL 2905657, at *6 ("[T]he Parity Act requires only that nonquantitative treatment limitations for mental health benefits be "*comparable to*" and "applied no more stringently than for medical/surgical benefits") (quoting 29 C.F.R. § 2590.712(c)(4)(iii) (emphasis in original)).

[117] Pls.' MSJ 34.

[118] *See E.W.*, 86 F.4th at 1297–98.

InterQual Criteria related to serious emotional disturbance, the Tenth Circuit concluded that "Health Net's denial letters demonstrate that it did in fact consider all criteria relevant to a serious emotional disturbance even if it did not recite each criterion verbatim."[119] Accordingly, the court declines to consider Plaintiffs' argument "under the general rule that a district court is bound by decisions made by its circuit court."[120]

### III.    Prejudgment Interest, Attorney Fees, and Costs

Lastly, Plaintiffs make two arguments regarding attorney fees.[121] First, they argue their success at the Tenth Circuit entitles them to attorney fees and costs of litigation leading up to the resolution of their appeal before the Tenth Circuit.[122] Second, Plaintiffs assert they should also be awarded attorney fees and costs for all litigation following the Tenth Circuit's remand, pursuant to 29 U.S.C. § 1132(g), if they prevail on their motion for summary judgment.[123] In response, Health Net asserts Plaintiffs are not entitled to fees and costs, and both parties request the opportunity to file supplemental briefing to address the issue.[124]

The court acknowledges Plaintiffs have succeeded in some degree on the merits.[125] Therefore, the court grants both parties leave to file supplemental briefing on attorney fees before making its determination on the issue.

---

[119] *Id.*

[120] *Dish Network Corp. v. Arrowood Indem. Co.*, 772 F.3d 856, 864 (10th Cir. 2014).

[121] Pls.' MSJ 39–40; Pls.' Reply 14.

[122] Pls.' MSJ 39–40.

[123] *Id.*

[124] Pls.' Reply 14; Defs.' Reply to Mot. for Summ. J. ("Defs.' Reply") 9, ECF No. 137, filed Nov. 11, 2025.

[125] *See Gordon v. U.S. Steel Corp.*, 724 F.2d 106, 109 (10th Cir. 1983).

**ORDER**

For the reasons stated above, the court DENIES Plaintiffs' Motion for Summary Judgment[126] and GRANTS Defendants' summary judgment in part on the Parity Act claim.[127] The court will address attorney fees and costs after the parties have briefed the issue.

Signed March 23, 2026.

BY THE COURT

_____
David Barlow
United States District Judge

---

[126] ECF No. 116.
[127] ECF No. 109.